Daniel J. Kornstein (DK-3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

| | | |
|---|---|---|
| RMM GROUP, LLC, | : | |
| Plaintiff, | : | 07 CV 10482 (GBD) |
| -against- | : | NOTICE OF MOTION |
| CINEVISIONS, SEVEN ARTS | : | |
| PICTURES INC., SEVEN ARTS | | ECF CASE |
| PICTURES LIMITED, SEVEN ARTS | : | |
| PICTURES PLC and PETER HOFFMAN, | | |
| | : | |
| Defendants. | : | |

--------------------------------------------------- X

PLEASE TAKE NOTICE THAT, upon the annexed declaration of Peter Hoffman dated February 13, 2008 and the exhibit annexed thereto, defendants Seven Arts Pictures Inc., Seven Arts Pictures plc and Peter Hoffman (the "Moving Defendants") will move the Court before the Honorable George B. Daniels at the Courthouse, 500 Pearl Street, Courtroom 12B, New York, New York 10007, on March 11, 2008, at 10:00 a.m. or as soon thereafter as counsel may be heard, for an order:

a.    Dismissing this action as against the Moving Defendants pursuant to F.R.C.P 12(b)(2) based upon lack of jurisdiction over the person;

b.    Dismissing this action as against the Moving Defendants pursuant to F.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted; and

c.     Granting such other and further relief as to the Court may seem just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Civil Rule 6.1, answering papers, if any, must be served on the undersigned on or before March 3, 2008, and reply papers, if any, must be served on or before March 10, 2008.

Dated:     New York, N.Y.
           February 15, 2008

                              KORNSTEIN VEISZ WEXLER &
                              POLLARD, LLP

                              By: _____
                                  Daniel J. Kornstein (DK-3264)
                              757 Third Avenue
                              New York, New York 10017
                              (212) 418-8600
                              Attorneys for Defendants CineVisions,
                              Seven Arts Pictures Inc., Seven Arts
                              Pictures Limited, Seven Arts Pictures
                              Plc and Peter Hoffman

TO:     Scott R. Emery
        LYNCH DASKAL EMERY LLP
        264 West 40TH St.
        New York, New York 10018
        (212) 302-2400
        Attorneys for Plaintiffs

Daniel J. Kornstein (DK-3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

RMM GROUP, LLC,                          :

      Plaintiff,                         :    07 CV 10482 (GBD)

   -against-                              :    <u>DECLARATION</u>

CINEVISIONS, SEVEN ARTS              :    ECF Case
PICTURES INC., SEVEN ARTS
PICTURES LIMITED, SEVEN ARTS        :
PICTURES PLC and PETER
HOFFMAN,                                 :

      Defendants.                        :

----------------------------------------------------- X


STATE OF CALIFORNIA          )
                       : 
COUNTY OF LOS ANGELES   )

      PETER M. HOFFMAN, pursuant to 28 U.S.C. § 1746, declares as follows:

      1.    I am the Chief Executive Officer of defendants Seven Arts Pictures PLC ("PLC") and Seven Arts Pictures Inc. ("SAP"). I have personal knowledge of the facts set forth in this declaration, which I submit in support of the motion of PLC, SAP, and myself (together, the "Moving Defendants") to dismiss the complaint (a copy of which is annexed hereto as Exhibit A). The limited purpose of this declaration is to set forth the indisputable facts that show why this Court lacks personal jurisdiction over

the Moving Defendants and to put before the Court those documents on which plaintiff's claims rely.

Moving Defendants Not Present in New York

2.    I am a citizen and resident of the State of California.

3.    I have not resided in New York in more than thirty years. Nor have I ever owned any real estate in New York. I do not transact any business in New York.

4.    I have no office in New York, no bank accounts or other property in New York, no employees resident in New York, and have not engaged in a continuous and systematic course of doing business in New York.

5.    Defendant PLC is an English corporation with its principal place of business in London, England.

6.    Defendant PLC transacts no business in New York; has no office in New York, has no bank accounts, real estate, or other property in New York; and has not otherwise engaged in a continuous and systematic course of doing business in New York.

7.    Defendant SAP is a Nevada corporation with its principal place of business in Los Angeles, California.

8.    Defendant SAP transacts no business in New York; has no office in New York; has no bank accounts, real estate, or other property in New York; has no employees resident in New York; and has not otherwise engaged in a continuous and systematic course of doing business in New York.

Distribution Agreement Not Substantially
Negotiated or Performed by Moving Defendants in New York

9.    None of the Moving Defendants has transacted any business in New York that has any articulable nexus to the claims alleged in the complaint.   None of the Moving Defendants is a party to the Distribution Agreement dated April 4, 2002 among Will & Co. Productions Limited ("WCP"), CineVisions ("CV") and Seven Arts Pictures Limited ("SAL"), which is attached as Exhibit 1 to the complaint.

10.    None of the Moving Defendants has agreed to assume any liabilities to plaintiff pursuant to the Distribution Agreement or otherwise executed or agreed to perform the Distribution Agreement.   None of the Moving Defendants has agreed, directly or indirectly, to Paragraph 4.4 of the Distribution Agreement under which SAL and CV consented to the jurisdiction of this Court (the "Jurisdiction Clause").

11.    The Distribution Agreement, relating to the distribution of a motion picture titled "I'll Sleep When I'm Dead" (the "Picture") only outside the United States and Canada, was negotiated between myself, solely as a representative of CV and SAL, and representatives of WCP in the two to three months before April 4, 2002.  I had telephone conversations and exchanged correspondence with representatives of WCP in New York City, all of which was initiated by these representatives, but I traveled to New York on only one occasion to discuss the Distribution Agreement with Plaintiff (and not WCP).  None of these conversations had any connection with business in the State of New York; they related to delivery and release of the Picture, none of which occurred in the State of New York.   The principal "face-to-face" negotiations with WCP occurred in Los Angeles.

12.    SAP and PLC did not even exist as corporations when the Distribution Agreement was negotiated and executed and did not participate in any form in such negotiations and execution.

13.    The Distribution Agreement does not constitute a contract to provide goods or services in New York. I acted solely as an officer of SAL and CV, not as an individual, in all actions I undertook with respect to the Distribution Agreement. I performed no actions on behalf of SAL or CV in New York in performance of the Distribution Agreement at any time. I did not actively project myself into New York on behalf of SAL and CV and only responded to certain comments and negotiations of WCP's representatives residing in New York. The Picture was produced entirely in the United Kingdom and was delivered, months after the contract deadline, to CV and SAL in London and in Los Angeles.

14.    SAP and PLC did later undertake some actions in distribution of the Picture, but all telephone conversations with a representative of WCP in New York (of which there were no more than five), all of which were initiated by WCP, were with me as a representative of SAL and CV. None of these telephone calls had any connection with business in the State of New York.

15.    Solely as an officer of SAL and CV, I had one or two telephone conversations with, and one meeting with, representatives of plaintiff, whose principals are residents of Massachusetts or Connecticut. SAP and PLC had no contacts of any kind with plaintiff before the filing of this action.

Complaint States No Claim Against Me

16.    The complaint alleges I am the owner, operator and/or majority shareholder of the other defendants.  This is untrue with respect to PLC, though I have at all times acted as an officer of these defendants.

17.    I personally received no benefit from the Distribution Agreement, all of whose benefits accrued to CV and SAL, both of which were duly organized corporations.  CV declined WCP's request for a personal guarantee from me.  CV and SAL have conducted all business with WCP through their corporate firm and none of this business was conducted by me personally.  CV and SAL have transferred no proceeds from distribution of the Picture to me.

18.    For the reasons given here and in the accompanying memorandum of law, the motion should be granted in its entirety, and the complaint dismissed as against the Moving Defendants.

19.    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 1?, 2008

PETER M. HOFFMAN

Exhibit A

# JUDGE DANIELS

Scott R. Emery (SE-6293)
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York 10018
(212) 302-2400

Attorneys for RMM Group, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

RMM GROUP, LLC,

                Plaintiff,

           v.

CINEVISIONS, SEVEN ARTS PICTURES, INC.,
SEVEN ARTS PICTURES, LTD., SEVEN ARTS
PICTURES PLC and PETER HOFFMAN,

                Defendants.

------------------------------------------------------------X

**07 CV 10482**

Civ. No.:

Date Filed:

**COMPLAINT**

**JURY TRIAL
DEMANDED**

NOV 28 2007
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff RMM Group, LLC ("RMM"), by its attorneys, Lynch Daskal Emery LLP, and

for its Complaint against Defendants Cinevision, Seven Arts Pictures, Inc., Seven Arts Pictures,

Ltd., Seven Arts Pictures PLC and Peter Hoffman ("Defendants"), states as follows:

## INTRODUCTION

      This case arises out of the Defendants' breach of a motion picture distribution agreement.

Pursuant to that agreement, the Defendants agreed to pay a minimum guaranteed amount in

exchange for all foreign distribution rights to the 2003 motion picture "I'll Sleep When I'm

Dead" (the "Picture").  The Defendants distributed the Picture, but failed to pay $3,441,000 of

that minimum guaranteed fee.

## PARTIES

1.     The distribution agreement for the Picture is dated April 4, 2002 (the "Distribution Agreement") and involved three signatories: 1) Will & Co. Productions Limited ("Will & Co."), a UK company; 2) Defendant CineVisions; and 3) Defendant Seven Arts Pictures, Ltd.  A copy of the Distribution Agreement is attached hereto as Exhibit 1.

2.     RMM is a Massachusetts limited liability company with a principal place of business located at 13 Riverside Road, Weston, Massachusetts 02493.  RMM provided the financing for the production of the Picture to the Picture's producer, Will & Co.  As a result, RMM acquired all of Will & Co.'s rights, title, and interest in the Distribution Agreement.

3.     Defendant CineVisions is a California corporation with a principal place of business located at 1643 N. Queens Road, Los Angeles, California 90069, and a registered agent located at 10202 West Washington Boulevard #430, Culver City, California 90232 (attn: Marian Salas).  CineVisions has ceased business operations.

4.     Defendant Seven Arts Pictures, Ltd. is a United Kingdom Corporation with a place of business located at 6310 San Vicente Boulevard, Suite 510, Los Angeles, California 90048.  Seven Arts Pictures, Ltd. has ceased business operations.

5.     Defendant Seven Arts Pictures, Inc. is a Nevada Corporation with a place of business located at 6310 San Vicente Boulevard, Suite 510, Los Angeles, California 90048, and a registered agent located at 1643 North Queens Road, Los Angeles, California 90069 (attn: Peter Hoffman).  Seven Arts Pictures, Inc. is a successor in interest to CineVisions and/or Seven Arts Pictures, Ltd., and/or acquired CineVisions and/or Seven Arts Pictures, Ltd.'s rights and obligations under the Distribution Agreement.

6.    Seven Arts Pictures PLC is a United Kingdom Corporation with the same place of business as Seven Arts Pictures, Inc. (6310 San Vicente Boulevard, Suite 510, Los Angeles, California 90048). Seven Arts Pictures PLC is a successor in interest to CineVisions and/or Seven Arts Pictures, Ltd., and/or acquired CineVisions and/or Seven Arts Pictures, Ltd.'s rights and obligations under the Distribution Agreement.

7.    Defendant Peter Hoffman ("Hoffman") is the owner, operator and/or majority shareholder of CineVisions, Seven Arts Pictures, Ltd., Seven Arts Pictures, Inc., and Seven Arts Pictures PLC. Mr. Hoffman resides at 1643 North Queens Road, Los Angeles, California 90069, which is the same address as Defendant Cinevisions' principal place of business and Defendant Seven Arts Pictures, Inc.'s registered agent.

8.    CineVisions, Seven Arts Pictures, Ltd., Seven Arts Pictures, Inc., Seven Arts Pictures PLC, and Hoffman have done business simply as "Seven Arts" or "Seven Arts Pictures." Accordingly, CineVisions, Seven Arts Pictures, Inc., Seven Arts Pictures, Ltd., Seven Arts Pictures PLC, and Hoffman are collectively referred to hereinafter as "Seven Arts."

## JURISDICTION

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between citizens of different states.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b), because the Distribution Agreement designates New York law as controlling and requires the Defendants to keep written books of account at an office in New York, (*see* Exhibit 1 at ¶¶ 4.3 & 5.2), and, upon information and belief, the Defendants regularly transact business in New York.

3

## FACTS

11.    Seven Arts is in the business of leasing or licensing rights to motion pictures. (*Id.* at ¶¶ 1.1 & 1.6(A).)

12.    Pursuant to the Distribution Agreement, Will & Co., the Picture's "Producer," provided to Seven Arts the rights to license or lease to third-parties outside of the United States all distribution rights in and to the Picture for a term of fifteen years commencing on April 4, 2002. (*Id.* at ¶¶ 1.1, 1.6 & 1.7.)

13.    The Distribution Agreement required Seven Arts to deposit all gross profits received by it in connection with the licensing or leasing of the distribution rights of the Picture into a bank account held in the name of the Producer (defined as the "Collection Account"). (*Id.* ¶ 1.5.) Seven Arts then received a fee equal to a percentage of these gross profits, which was dependant on the total profits generated by Seven Arts, plus reimbursement for certain enumerated costs. (*Id.* ¶¶ 1.8 & 1.9.) The remaining profits were to be retained by the Producer. (*Id.*)

14.    The Distribution Agreement contained a guarantee provision, whereby Seven Arts guaranteed that the Producer would receive $4,000,000 (less "Other Costs") in licensing profits on or before the "Shortfall Date." (*Id.* ¶ 1.10.)

15.    More specifically, the guarantee provisions provides in pertinent part:

1.10    <u>Seven Arts Guarantee.</u>    Seven Arts guarantees to Producer that the amount received by Producer from the Account will be not less than $4,000,000 . . . on or before the date 18 months after delivery to Seven Arts of the Delivery Items ("Shortfall Date") . . . . Should the amount received by Producer from the Account on or before the Shortfall Date be less than $4,000,000 (less Other Costs), Seven Arts shall immediately pay the amount by which the amount received by Producer is less than $4,000,000 (less Other Costs) into the Account for distribution to Producer ("Shortfall Payment").

16.    The "Shortfall Date" was on or about January 2006.

17.    As of January 2006 (and presently), the Collection Account contained only $559,000.

18.    Accordingly, pursuant to the terms of the Distribution Agreement, a Shortfall Payment of approximately $3,441,000 is due from Seven Arts to the Producer. Because RMM acquired all the Producer's rights and interest in Distribution Agreement, this payment is owed to it.

19.    Pursuant to the terms of the Distribution Agreement, Seven Arts is also liable to RMM for all attorneys' fees and costs incurred in the instant litigation.  (*Id.* at ¶ 4.4 ("In the event of any action, suit or proceeding hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees, in addition to the costs of said action, suit or proceeding."); *id.* at ¶ 3.2 (Cinevisions "agrees to indemnify Producer, its officer, employees, shareholders, directors, successors, assigns and affiliates from any loss arising from Seven Arts' breach of this Agreement."))

## Count I
### (Breach of Contract)

20.    Plaintiff repeats and incorporates each and every allegation contained in paragraphs 1 through 19.

21.    Plaintiff (and its assignor, Will & Co.) fully performed its obligations under the Distribution Agreement.

22.    Defendants breached the Distribution Agreement by, among other things, failing to make the requisite Shortfall Payment into the Collection Account on or after January 2006.

23.    Thus, as a direct and proximate result of the Defendants' breach of contract, Plaintiff has been damaged in excess of $3,441,000, plus attorneys' fees and interest.

## Count II
### (Breach of the Implied Covenant of
### Good Faith and Fair Dealing)

24.     Plaintiff repeats and incorporates each and every allegation contained in paragraphs 1 through 23.

25.     Defendants breached the covenant of good faith and fair dealing implied in the Distribution Agreement by, among other things, intentionally failing to make the requisite Shortfall Payment into the Collection Account on or after January 2006 and transferring rights and interests in the Distribution Agreement to non-signatories to the Distribution Agreement in an attempt to avoid their responsibility for failure to timely make the requisite Shortfall Payment.

26.     As a result of the Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages.

## Count III
### (Quantum Meruit)

27.     Plaintiff repeats and incorporates each and every allegation contained in paragraphs 1 through 26.

28.     Plaintiff, through Will & Co, provided to Seven Arts the rights to license or lease to third-parties located outside of the United States all distribution rights in and to the Picture for a term of fifteen year.

29.     Seven Arts reasonably knew and understood that Plaintiff expected to be compensated for its award of such rights to Seven Arts in an amount of no less than $4,000,000 on or before January 2006.

30.     To date, Plaintiff has only received approximately $559,000 for the award of such rights. As a result, Plainitff has been damaged in excess of $3,441,000.

6

WHEREFORE, Plaintiff demands a trial by jury on all issues so triable and respectfully requests that this Court enter judgment against Defendants on all counts and award Plaintiff the following relief:

1)   damages in an amount to be determined by a jury as described herein;

2)   attorneys' fees and costs; and

3)   such other relief that the Court deems just and proper.

Dated: November 19, 2007          LYNCH DASKAL EMERY LLP
      New York, New York           Attorneys for RMM Group, LLC

                            Scott R. Emery (SE-6293)
                          264 West 40th Street
                          New York, New York 10018
                          (212) 302-2400

# EXHIBIT 1



**S E V E N   A R T S**

April 4, 2002

WILL & CO. PRODUCTIONS LIMITED
c/o Davenport Lyons
Old Burlington Street
London, England WIS 3NL

Re:    I'LL SLEEP WHEN I'M DEAD

Gentlemen:

You ("Producer") intend to produce a theatrical motion picture currently entitled "I'LL SLEEP WHEN I'M DEAD" (the "Picture") to be directed by Mike Hodges ("Hodges"), based on a screenplay dated September 2000 written by Trevor Preston ("Screenplay"), and with the following designated cast ("Designated Cast"):

| Actor | Role |
|-------|------|
| Clive Owen | Will Graham |
| Charlotte Rampling | Helen |
| Jonathan Rhys-Meyer | ~~Mickser~~ DAVEY |
| Malcolm McDowell | Turner |

The Picture has an estimated direct cost cash budget in the form previously delivered to Seven Arts of no less than $6,000,000 and a fully absorbed budget which includes all deferrals, financing charges, delivery charges, overhead and development fees ("Total Budget"). Hodges and Mr. Owen will be deemed "essential elements" and if either person's services as the sole director and as actor in the role of "Will Graham", respectively, are not embodied in the Picture, then Seven Arts may terminate all its obligations to Producer hereunder. No other person shall be deemed an "essential element" for purposes hereof.

The undersigned, CineVisions, a California corporation, and Seven Arts Pictures Ltd., a UK corporation, both d.b.a. Seven Arts International (collectively "Seven Arts"), agree with Producer as follows:

1.    Grant of Lease Rights

     1.1    Lease of Rights. Producer grants to Seven Arts for the "Term" (defined below) and in the "Territory" (defined below) the rights to license or lease to others all distribution rights in and to the Picture including "Cinematic Rights", "Television Rights", and "Video Rights" as defined in Exhibit "A" (the "Rights"), on the terms and conditions of this Agreement. As between Seven Arts and Producer, Producer reserves and Seven Arts shall have no right to lease or license music publishing soundtrack, merchandising, publication, all sequel, prequel, remake and television production rights and any legitimate stage rights. All rights not specifically granted to Seven Arts are reserved to Producer.   Seven Arts agrees to use all reasonable commercial efforts to license or lease the Picture on the best possible commercial terms. Producer understands that Seven Arts is in the business of license and lease of other motion pictures including motion pictures produced by its affiliates. Seven Arts will lease Rights to third persons through one or more affiliated or related corporation ("Licensing Entities") which will be used to reduce or eliminate withholding, remittance or royalty based taxes ("Taxes"), including Pueblo Hungary KFT, a Hungarian corporation. Seven Arts shall cause the Licensing Entities to comply with all the terms hereof as if the Licensing Entities were Seven Arts and receipts of the Licensing Entities will be deemed receipts of Seven Arts for all purposes hereunder.

     1.2    Terms of Lease Agreements. Producer and Seven Arts agree that the Rights will be licensed at least on the terms ("Accepted Distribution Terms") set forth in the form lease agreement, attached as Exhibit "A" ("Lease Agreement") or on terms more favorable to Producer, with such amendments as may be approved by counsel for Producer. Producer agrees to designate a natural person as the "Agent" for such approval by notice in writing to Seven Arts, but may change the Agent from time to time by written notice to Seven Arts. Producer agrees that any amendments to a Lease Agreement shall be deemed approved by Agent if no written disapproval and statement of acceptable terms is received within 10 business days after receipt of written notice by the Agent, or within 2 business days if during one of the three major international markets, i.e. the Festival du Film and Marche in Cannes, the American Film Market in Los Angeles, and the MIFED in Milan. Any amendments to a Lease Agreement approved or deemed approved (as provided above) by the Agent shall be Accepted Distribution Terms for that Lease Agreement. The Lease Agreement shall provide "holdbacks" approved by the Agent against the use of Rights by lessees as may be requested by a distributor for the Domestic Territory, defined below. Producer shall jointly exercise with Seven Arts all approval or consultation rights granted to Seven Arts under any Lease Agreement.

     1.3    MGs.   Attached as Exhibit "B" is Seven Arts' schedule of "Ask" and "Accept" levels of minimum guarantees ("MGs") (Payable on or within 12 months after delivery of the Picture) and Seven Arts' list of acceptable distributors in each part of the territory ("Accepted Distributors"). Seven Arts may accept an offer for lease of Rights with MGs at or above the "Accept" level and with Accepted Distribution Terms from an Accepted Distributor. All other offers will be delivered to Agent. Seven Arts may not accept any offer for lease of Rights so delivered to Agent without the prior written approval of Agent. Notwithstanding the foregoing, should Seven Arts not have arranged principal territory licenses with minimum guarantees equal to or greater than the Seven Arts Guarantee (defined below) on or before

delivery of the Picture under the terms hereof, then Seven Arts may lease Rights on any financial terms to any distributor as it determines in good faith, i.e. without alteration of the other approved legal terms in the Lease Agreement.

1.4    Ancillary Rights.    Certain transactions regarding the Picture may not be subject to lease pursuant to Lease Agreements or be described on Exhibit "B". Any license or lease of such Rights not reserved to Producer hereunder shall be on terms and pursuant to agreements approved in writing by Agent, which shall not be unreasonably withheld.

1.5    Collection Account.    Seven Arts shall deposit all gross monies and other consideration of any kind actually received by Seven Arts or the Licensing Entities with respect to the Rights ("Seven Arts Gross") with a collection/escrow account in Producer's name, pursuant to a Collection Agreement as shall be mutually approved by other parties. To implement its agreement to the foregoing, Seven Arts agrees to require all licensees or lessees of Rights to execute and deliver to the benefit of Producer an irrevocable notice of assignment in a form approved by Agent (or the equivalent language in the Lease Agreement) to pay all monies due with respect to the Picture into the Account. Producer understands that Taxes or bank charges may be deducted by lessees or licensees prior to receipt of any Seven Arts Gross and the Licensing Entities will be entitled to retain for their account 1% of the Seven Arts Gross from the territories of Japan, Italy, Spain and Korea for payment to unrelated third parties in connection with reduction of the 8-10% Taxes otherwise applicable in those territories. Producer and any parties providing finance for the Picture shall have a security interest in the Account, the Picture and any Lease Agreements, in the form of Exhibit "X", provided that no such security interest may limit, impair or affect Seven Arts' rights to disbursements of Fees and Costs described below.

1.6    Term.    The Term shall be fifteen (15) years from the date hereof and may be extended at the option of Seven Arts (exercised by notice in writing to Agent) for 2 successive 5 year periods ("First Extended Term" and "Second Extended Term"), as long as at the date the Term would otherwise expire:

A.    Seven Arts remains currently active in the business of leasing and licensing rights to motion pictures and is not and has not been subjected to any bankruptcy insolvency or creditor reorganization under the laws of any jurisdiction, and Peter Hoffman is personally available to supervise and control Seven Arts' activities hereunder.

B.    Seven Arts has not received written notice of any material breach by it of the terms hereof and fails to cure such breach prospectively within 10 business days of receipt of such notice.

C.    In the case of each First Extended Term and the Second Extended Term, Producer will have received respectively, $5,000,000 and $6,000,000 as distribution from the Account on or before the date the Term would otherwise expire.

During the initial Term, Seven Arts may not enter Lease Agreements for a term that continues after the expiration of the Term. Seven Arts may enter into Lease Agreements in the First and

Second Extended Term for a distribution term that continues after expiration of the Term, so long as such distribution term is customary in the international film sales business and not in perpetuity. No termination or expiration of the Term shall affect Seven Arts rights to Fees or Costs (defined below) payable at any time pursuant to or by reason of any license or lease of Rights in the Territory during the Term. Producer may terminate the Term at any time only for the reasons in A, B and C above. Should Producer reasonably believe that Seven Arts has engaged in a material breach and has not prospectively cured such breach, Producer shall advise Seven Arts in writing of its desire to terminate the Term. Should Seven Arts object to this decision, Seven Arts and Producer shall arbitrate such dispute pursuant to the provisions for "expedited" arbitration under the rules of the American Arbitration Association in New York (the "Arbitration") and if the arbitrators agree with Producer's determination the Term shall terminate upon rendering of this decision. Notwithstanding the foregoing, the Term will automatically terminate and all Rights will revert to Producer if the Producer has not received $4,000,000 from the Account (less Costs described in Paragraph 1.9 B and C) on or before the Shortfall Date and Seven Arts' shall have the right to reinstate the grant of Rights only if it can establish in Arbitration that the failure of Producer to receive $4,000,000 (less Costs described in Paragraph 1.9 B and C) on or before the Shortfall Date is not a material breach hereof. No termination of the Term shall limit, impair or affect Producer's rights for damages or other relief against Seven Arts for any breach of this Agreement by Seven Arts.

   1.7 <u>Territory</u>. The Territory shall be the universe <u>excluding</u> the United States, its territories and possessions, as customarily defined by the major studios ("Domestic Territory").

   1.8 <u>Fees</u>. Seven Arts will be entitled to distribution fees ("Fees") from the Account under the Collection Agreement of the following percentages of Seven Arts Gross ("Fees")·

     A. 7.5% of Seven Arts Gross until Producer has received $4,000,000 from the Account. This Fee may be deferred as provided in Paragraph 1.10 below.

     B. 15% of Seven Arts Gross in excess of $4,000,000 until Producer has received $7,000,000 from monies paid to it from the Account or any other source with respect to the Picture.

     C. 50% of Seven Arts Gross in excess of A and B above until Seven Arts has received a fee of 15% of all Seven Arts Gross from the first dollar.

     D. 20% of Seven Arts Gross in excess of A, B and C above. Seven Arts shall have no right to any Fees with respect to the license of any rights on the Picture for distribution in the United States or with respect to any UK sale-lease back transaction.

   1.9 <u>Costs</u>. Seven Arts will be entitled to distribution from the Account under the Collection Agreement of:

A.  its actual direct third-party out-of-pocket costs of distribution and marketing of the Picture for which it provides bona fide invoices to the Agent excluding Seven Arts' general overhead and convention expense and not in excess of $125,000, without written approval of Agent, and Seven Arts shall allocate any distribution and marketing expenses among the Picture and other motion pictures on a fair and reasonable basis and shall not in any event offset any costs in respect to any other motion picture against sums due to producer hereunder.

B.  any costs to manufacture or create any "Delivery Items" defined below not delivered to Seven Arts by Producer.

C.  any legal fees and expenses arising by means of Producer's breach of the warranties set forth below.

1.10  <u>Seven Arts Guarantee.</u>  Seven Arts guarantees to Producer that the amount received by Producer from the Account will be not less than $4,000,000 (less any sums deducted and paid to Seven Arts pursuant to Paragraph 1.9 B and C above ["Other Costs"]) on or before the date 18 months after delivery to Seven Arts of the Delivery Items ("Shortfall Date") and Seven Arts will defer its Fees until that sum has been received by third party contract minimum or other guarantees with respect to the Picture. Should the amount received by Producer from the Account on or before the Shortfall Date be less than $4,000,000 (less Other Costs), Seven Arts shall immediately pay the amount by which the amount received by Producer is less than $4,000,000 (less Other Costs) into the Account for distribution to Producer ("Shortfall Payment"). Seven Arts shall be entitled to recover any Shortfall Payment from 100% of all Seven Arts Gross later paid into the Account without dimunition of Seven Arts' right to Fees and Costs as herein provided.

1.11  <u>Sale of Picture.</u>

A.  <u>First Negotiation.</u>  If at any time Producer intends to license, sell, transfer, assign, hypothecate or in any way convey or dispose of Producer's copyright or other ownership interest in the Picture to an unrelated person (the "Interest"), Producer shall, before offering the Interest to any other party, give Seven Arts written notice (the "Notice") of the terms on which Producer wishes to negotiate in respect of the Interest; provided, however, that any term relating to the consideration for the Interest shall be expressed as, or readily reducible to, a determinable sum of money. If Producer notifies Seven Arts that it wishes to negotiate regarding the Interest, Seven Arts and Producer shall negotiate in good faith regarding the Interest. If either (A) Seven Arts fails to give Producer notice of its desire to negotiate within a ten (10) business day period or (B) Seven Arts and Producer fail to reach an agreement regarding the Interest within thirty (30) days following the commencement of their negotiations with respect hereto, Producer shall have the right to offer the Interest to other parties and Seven Arts shall make its last bid offer to acquire the interest ("Last Offer"), if Seven Arts so elect.

B.  <u>Last Refusal.</u>  If Producer receives any bona fide offer to license, lease, purchase or in any way acquire the Interest after completion of the procedure in 1.11A above on financial terms equal to or less than those set forth in any Last Offer and Producer proposes to accept such offer, Producer shall notify Seven Arts in writing accordingly (the "Sale

Notice"). The Sale Notices shall set forth all of the material terms and conditions of such offer, including the consideration to be paid (which shall be expressed as, or readily reducible to a determinable sum of money, any other consideration being deemed to be excluded from the offer) and the method of payment thereof (collectively, the "Terms"). During the period of ten (10) business days following Seven Arts' actual receipt of the Sale Notice, Seven Arts shall have the exclusive option (the "Interest Option") to license, lease and/or purchase the Interest upon the Terms. If Seven Arts elects to exercise the Interest Option, Seven Arts shall notify Producer accordingly within said ten (10) business day period, and Seven Arts shall, upon payment to Producer of the consideration specified in the Sale Notice, automatically acquire such Interest on the Terms as supplemented by all of the terms and conditions of this Agreement not inconsistent therewith; provided, however, that Seven Arts shall not be required to accept or meet any Term which may not be met as easily by one person as another, and all such Terms shall be deemed to be excluded from the offer contained in the Sale Notice. If Seven Arts fails to exercise the Interest Option within the aforementioned ten (10) business day period or notifies Producer in writing that it will not exercise the Interest Option, Producer may convey the Interest to the Offeror on the Terms provided that the Interest is then conveyed within six (6) months to such Offeror. The provisions of this Agreement shall continue in full force and effect and shall be binding upon any Offeror.

2.    Production and Delivery of the Picture

2.1    Creative Control Delivery.    Producer shall produce and deliver the Picture and shall have, as between Seven Arts and Producer, complete creative and business control of the Picture including "final cut" except that:

A.    Producer shall deliver to Seven Arts the delivery material listed on Exhibit "D" ("Delivery Items") of a first class technical quality on or before the date eleven (11) months after commencement of principal photography, subject to extension for "force majeure" by up to an additional 120 days, but no later than February 28, 2004 ("Outside Date"). Seven Arts shall cause Delivery to be made to each lessee under all Lease Agreements and in addition to the domestic distributor of the Picture, which is currently Paramount Classics.

B.    Lessees or Licensees of Rights may cut the Picture as provided in the Accepted Distribution Terms of any Lease Agreement.

C.    The Picture shall have a final cash direct production cost ("Final Cost") no less than the cash budget, will be directed by Hodges, will conform in all material respects to the Screenplay and will embody the performances of Clive Owen as "Will Graham". If the Producer does not deliver to Seven Arts the Delivery Item by the Outside Date all monies in the Account shall be returned to the payor(s). Seven Arts shall have no right to payment of any budget "underages":

2.2    Rights/Warranties.    Producer makes to Seven Arts, its officers, employees and affiliates, i.e. entities or persons under common control with, controlling or controlled by Seven Arts ("Indemnified Parties") all the same warranties and indemnities Seven

Arts makes to lessees or licensees under any Accepted Distribution Term of any Lease Agreement, mutatis mutandi. Producer shall fully indemnify all Indemnified Parties against any claim that Seven Arts is responsible for any failure to own Rights, copyright or other rights infringement, any failure to pay production costs, residuals, or participation, or any other matter not a direct result of the breach by Seven Arts of this Agreement. Seven Arts and its affiliates shall be named as additional insured on Producer's "errors & omissions" insurance for the Picture.

    2.3   Participations/Residuals.  · All participations and residuals shall be paid by Producer and Seven Arts shall have no responsibility therefore.

3.   Warranties and Guarantees of Seven Arts

    3.1   Ownership of Seven Arts.   Seven Arts is a business name of CineVisions ("CV"), a California corporation ,and Seven Arts Pictures, Ltd., both owned by Peter Hoffman. Seven Arts warrants that it and its affiliate, CV, are organized and in good standing under the laws of their respective jurisdictions and have the full power and authority to enter into and perform their respective obligations hereunder, and shall comply with all laws in their jurisdiction.

    3.2   Guarantees.   By their signature hereto, CV and Seven Arts Pictures Limited guarantees to Producer the full and timely performance of all of Seven Arts' obligations hereunder (including the obligation to cause the Licensing Entities to comply with all the terms hereof) and agree to execute and deliver to Producer such more formal agreements of guaranty as Producer may reasonably request, consistent with the terms hereof. CV agrees to indemnify Producer, its officer, employees, shareholders, directors, successors, assigns and affiliates from any loss arising from Seven Arts' breach of this Agreement.

    3.3   No Cross-Collateralization.   Seven Arts will not permit the reduction or offset of any Seven Arts Gross against the costs of any other motion picture.

    3.4  · Marketing.   Michael Kaplan or, if he is unavailable, the Agent, shall have the right to approve the "one sheet", trailer and other marketing materials used at any major sales market or to be delivered under any Lease Agreement, which approval shall be exercised promptly and shall not require expenditures greater than amounts in the Seven Arts marketing budget therefore. Agent shall jointly exercise with Seven Arts any rights of approval or consent in any Lease Agreement with regards to marketing and distribution of the Picture.

    3.5   Credit Obligations.   Seven Arts shall comply with a schedule of credit obligations with respect to the Picture determined solely by Producer delivered in writing to Seven Arts. Seven Arts shall be entitled to designate one person or entity to share the "Presentation" credit in the same size and prominence on the Picture and in the marketing materials referred to in Paragraph 3.4 above, in second or third position (depending on the other presentation credits given). All other aspects of such credit to Seven Arts shall be determined by Producer in its sole discretion.

4. <u>General Terms</u>

4.1    All statements and other documents or material to be delivered to Producer or Seven Arts shall be delivered to the applicable party at the applicable address set forth above. All notices to be given by either party under the terms hereof (a "Notice") shall be in writing and shall be deemed given (i) by addressing the applicable Notice as indicated below and by depositing that Notice air mail, postage prepaid, in the appropriate government mail system; (ii) by telefax; (iii) by delivering the applicable Notice, toll prepaid, to a telegraph or cable company; (iv) Federal Express; or (v) by hand delivery. All Notices shall be deemed given only on receipt, except for notices sent by the appropriate government mail system which notices shall be deemed given 3 days after deposit in such system. The addresses of the parties, until Notice to the contrary, are as set forth in the heading of this Agreement. Courtesy copies of all Notices shall be provided to: John Sloss at 555 West 25th Street, 4th Floor, New York, New York 10001 and Bob Kaplan at 1541 Ocean Avenue, Suite 200, Santa Monica, California 90401.

4.2    This Agreement supersedes any and all oral and written agreements, promises, statements, representations and information given by either party and contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and the transactions contemplated hereby; all prior discussions, agreements and understandings of any nature between the parties are merged herein and superseded hereby. This Agreement may not be modified orally; no waiver, amendment or modification shall be binding or effective unless in writing and signed by the party sought to be charged. Producer and Seven Arts shall execute any and all documents and instruments and shall do all acts which may be necessary or appropriate to fully implement the provisions of this Agreement.

4.3    This Agreement is subject to all applicable laws and treaties. This Agreement, its validity, construction and effect shall be governed by and construed under the laws of New York applicable to contracts executed therein and wholly to be performed therein. Paragraph headings used herein are for convenience only, are not part of this Agreement and shall not be used in construing it. Words used in the singular shall include the plural and vice versa. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. If any part of this Agreement is declared invalid or unenforceable by any governmental authority or court of competent jurisdiction, the validity of the balance of the Agreement shall not be affected.

4.4    In the event of any action, suit or proceeding hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees, in addition to the costs of said action, suit or proceeding. Lessor and Lessee, each as to and for the benefit of the other; (a) hereby irrevocably submit to the exclusive jurisdiction of the commercial courts in the County of New York (the "Applicable Court") for the purpose of any action, suit or proceeding arising out or based upon the subject matter of, or transactions contemplated by this Agreement (each an "Applicable Action"); (b) hereby irrevocably waive and agree not to assert (by way of motion, as a defense or otherwise) in any Applicable Action brought in the Applicable Court any claim (i) that it is not subject personally to the jurisdiction of the Applicable Court; (ii) that the Applicable Action is brought in an inconvenient forum; (iii) that the venue of the Applicable Action is

improper; or (iv) that this Agreement or its subject matter may not for any other reason be enforced in the Applicable Court; (c) hereby irrevocably consent to service of process of the Applicable Court in the same manner as any other Notice is served pursuant to Paragraph 4.1 above; and (d) irrevocably agree that final judgment (including the exhaustion of all rights to appellate review) in any Applicable Action ("Judgment") shall be conclusive and may be enforced in any other jurisdiction (i) by action, suit or proceeding on the Judgment, a certified and true copy of which shall be absolutely conclusive evidence of the fact and of the amount of any liability under or pursuant to the Judgment; or (ii) in any other manner not prevented by any applicable law.

4.5    All of Producer's and Seven Arts rights and remedies under this Agreement shall be cumulative. The exercise by either party of rights under any one provision hereof of their rights at law shall not be deemed an election of remedies. The waiver by either party of any breach of this Agreement shall not be deemed a waiver of any preceding or succeeding breach of the same or any other provision hereof. Neither party shall be deemed to have waived any provision hereof except in writing signed by the party to be charged.

4.6    Nothing in this Agreement shall be deemed to create a partnership, joint venture, or any relationship other than as a grant of sales rights and in no event shall either party be liable for the actions, statements or omissions of the other. There shall be no third party beneficiaries of this Agreement and this Agreement shall not be deemed to create or evidence any right to remedy of any third party, whether or not designated herein.

4.7    Producer shall have the right to assign its right to payment under this Agreement with Notice to Seven Arts. If Producer assigns any of its rights hereunder (to payment or otherwise) to any third party, Seven Arts shall upon the request of Producer and/or its assignee execute one or more undertakings (in such form as Producer and/or its assignee may reasonably require) whereby Seven Arts agrees to make payment and/or otherwise render performance directly to such assignee. Seven Arts may not assign or delegate its rights and/or obligations hereunder without the approval of Agent and Producer except as part of a sale or reorganization of all or substantially all of its assets.

5.    Statements and Audit.

5.1    Statements.    Seven Arts agrees to render to Producer periodic statements ("Statements") showing in summary form the calculation of the sums due to Producer under Paragraph 1 above. Statements shall be rendered with respect to each of the following periods ("Periods"):

A.    12 Periods of 3 months next succeeding delivery of the Picture or any Period of 3 months in which Net Receipts of at least $100,000 has been received in such Period.

B.    4 Periods of 6 months next succeeding the Periods defined in A.

C.    All subsequent Periods of 12 months in which either (i) at least $100 is due to Producer (and for this purpose any amounts due to Producer under $100 shall not be forfeited but accumulated and carried to subsequent Periods until the total amounts due to Producer are equal to or greater than $100) or (ii) Seven Arts receives a written request for a Statement from Producer prior to the end of the applicable Period.

Except as otherwise specifically provided herein, all Periods shall end on the regular statement dates selected by Seven Arts from time to time for reports to participants generally and the closing date of any Periods may be extended or shortened by up to forty-five (45) days to conform to these dates as they may change from time to time. All Statements and payments due with respect thereto shall be mailed to Producer at Producer's then current address for Notices under the terms of the Agreement, within forty-five (45) days after the end of each Period. Any Statements may be changed from time to time to effectuate year end or other adjustments by Seven Arts' accounting department or certified public accountants, to correct any errors or omissions or for similar purposes. All Statements shall include copies of any third-party accounting statements received by Seven Arts with respect to the Picture.

5.2    Audit.  Seven Arts agrees to keep at an office the location of which to be selected by Seven Arts (but, in any event, with copies in New York and Los Angeles) written books of account in Seven Arts' customary form (which shall be consistent with customary parameters within the entertainment industry) relating to the calculation of the sums due to Producer pursuant to this Agreement ("Participation Accounts"). Subject to the limitations set forth below, Producer shall have the right, at his sole expense, to examine the Participation Accounts to verify the accuracy of any Statement which has not become incontestable under the terms hereof (an "Examination").

A.    CPA Firm.    An Examination shall be conducted only by a firm of reputable certified public accountants.

B.    Timing.    An Examination (i) shall be conducted, only during normal business hours in such a manner as to not unreasonably interfere with Seven Arts' normal business activities and only at such places as the Participation Accounts are kept, (ii) shall not continue for more than forty-five (45) consecutive days and (iii) shall not be conducted more than once in any twelve (12) month period.

C.    Limit to Participation Accounts.    The Examination shall be limited to the Participation Accounts for the Picture and under no circumstance shall the Producer have the right to examine accounts for any other motion picture (for purposes of comparison or otherwise) or any general ledger or other accounts of Seven Arts relating to its business generally or of any other person connected with the Picture, except to establish that any allocation of revenues or costs among Pictures is fair and reasonable based on generally preceding industry standard.

D.    Limitation Periods.    Each Statement (and all items and information contained therein) shall be deemed correct and shall be conclusive and binding on Producer, and not subject to objection or contest for any reason, and Producer shall have no right

to make further Examination or to dispute any items or information in that Statement and shall forever be banned from commencing any action, suit or proceeding with respect to that Statement unless:

(i) Seven Arts shall receive from Producer an objection, in writing, specifying in detail the items or transactions which Producer contests, on or before the last day of the 36th full calendar month next succeeding the date the applicable Statement is mailed to or otherwise furnished to Producer; and

(ii) if no written agreement resolving such objection is entered into, Producer shall commence an action in an appropriate court based only on the claims made in the applicable written objection on or before the earlier of (a) the last day of the 24th full calendar month next succeeding the expiration of the period under subparagraph D.(i) above or (b) the expiration of the applicable statute of limitations.

Any items or transactions not specified in a written objection received by Seven Arts as provided above may not be contested after the expiration of the period provided in (i) above. Seven Arts, as a courtesy to Producer, may include cumulative information in a particular Statement. Producer agrees that the inclusion of any information in any Statement that has previously appeared in another Statement shall not recommence, extend or otherwise change the periods provided in (i) or (ii) above, except to the extent any information has been revised or corrected, in which event the periods provided in (i) and (ii) shall commence as of the date the Statement in which such revision or correction first appears is mailed or otherwise furnished to Producer. Seven Arts shall have the right to destroy any Participation Accounts relating to items or transactions reflected on any Statement which has become incontestable pursuant to the provisions of this Paragraph. Notwithstanding the foregoing, if Seven Arts has fraudulently failed to disclose and Seven Arts Gross, Producer may claim his share (if any) thereof under the terms hereof, without regard to this Paragraph D.

Please confirm your agreement to the foregoing by signing below where indicated.

Very truly yours,
CINEVISIONS

By: _____

AGREED AND ACCEPTED

WILL & CO. PRODUCTIONS Limited

By: _____

SEVEN ARTS PICTURES LTD.

By: _____

REVEREsalesagencyagmnt
5-22-02

11

<u>EXHIBIT "A"</u>

**Seven Arts International**
12 Chiswick Lane
London W4 2JE
<u>UNITED KINGDOM</u>

DATE: As of

ADDRESS
Phone:
Fax:
Attn.:

Re:     "I'll Sleep When I'm Dead"

Gentlemen:

When signed by you ("Lessee") and a duly authorized agent of us ("Lessor"), this letter ("Cover Letter") and the Standard Rental Terms and Schedules attached hereto or referenced herein will constitute the Agreement ("Agreement") concerning Lessor's lease to Lessee of certain Rights to Use certain tangible personal property (the "Picture") embodying the Motion Picture now referred to by the title stated above. Unless otherwise defined in this Cover Letter, defined terms (indicated by capital letters) are used as defined in the Standard Rental Terms. The following are the basic terms of the Agreement:

A.     <u>TERRITORY/TERM</u>

    1.     <u>Territory</u>.

            ("Territory")

    2.     <u>Term of Lease of Rights</u>. The Term shall commence on the signature and delivery of this Agreement by both parties and shall expire ___ (__) years after Delivery as defined hereunder in Paragraph I., unless sooner terminated in accordance with the terms of this Agreement, and subject to extension for a non-exclusive Sell-Off Period with respect to Video Rights (if granted hereunder) as provided in the Standard Rental Terms.

B.    RIGHTS/LANGUAGES

    1.    Rights.

    Lessor leases to Lessee only the Rights to Use the Picture indicated below, and all Incidental Rights pertaining thereto, for the Territory, during the Term and in the Languages, subject to any Holdback Period indicated below and to any other exceptions, limitations and restrictions set forth in this Agreement.  All Holdback Periods, unless otherwise indicated, shall commence on the first authorized theatrical release in the Territory.

| Cinematic Rights | Leased to Lessee | Reserved to Lessor | Holdback Period |
|---|---|---|---|
| Theatrical | _____ | _____ | theatrical release in the United States |
| Non-Theatrical | _____ | _____ | theatrical release in the United States |
| Public Video | _____ | _____ | theatrical release in the United States |
| **Video Discs\*** | | | |
| NTSC | _____ | _____ | N/A |
| PAL | _____ | _____ | 6 months |
| SECAM | _____ | _____ | N/A |
| **Videocassettes\*** | | | |
| NTSC | _____ | _____ | N/A |
| PAL | _____ | _____ | 6 months |
| SECAM | _____ | _____ | N/A |
| **Ancillary Rights** | | | |
| Airline | _____ | _____ | N/A |
| Ship | _____ | _____ | N/A |
| Hotel | _____ | _____ | 9 months |

\*For the avoidance of doubt, these rights include all so-called "sell-through" distribution rights for Video.  Video Disc Rights include all so-called Laser Discs, VCD, CD ROM & DVD Rights.

| Televisions Rights | Leased to Lessee | Reserved to Lessor | Holdback Period |
|---|---|---|---|
| Pay-Per-View Rights | | | |
| Encoded Scheduled Playdate | _____ | _____ | 9 months |
| Video On Demand | _____ | _____ | Only with Lessor Consent |
| Pay TV Rights | | | |
| Terrestrial | _____ | _____ | 2 years |
| Cable | _____ | _____ | 2 years |
| Satellite | _____ | _____ | 2 years |
| Free TV Rights | | | |
| Terrestrial | _____ | _____ | 2 years |
| Cable | _____ | _____ | 2 years |
| Satellite | _____ | _____ | 2 years |

2.  Languages.  The Languages shall be as indicated below and shall be used only in dubbed or subtitled versions as indicated below.  The dialogue aural track(s) on any subtitled versions shall be in the English language.

| Languages | Dubbed or Subtitled |
|---|---|
| XXXXXX | Dubbed and subtitled |

3.  Internet Rights.  Lessor shall not Use or authorize any other person to Use Internet Rights in the Picture for the Territory in the Languages during the Term without the written approval of Lessee, if Pay Per View Rights are leased to Lessee hereunder.  Lessee may Use Internet Rights to Advertising Materials in connection with the promotion, advertising and publicity for Use of Rights leased hereunder.

C.  ADVANCE RENTALS

1.  Lessee shall pay to Lessor the following amount(s) in U.S. Dollars on the following date(s) as Advance Rentals.  Payment of Advance Rentals shall be secured or guaranteed by the Security, if any, indicated below, as well as the Notice of Assignment.

TOTAL: U.S. $ payable as follows:

REVEREsalesagencyagmnt
5-22-02

14

| Amount of Payment (US$) | Date Payment Due | Security |
|---|---|---|
| 10% (U.S. $) | On execution of this Agreement | N/A |
| 10% (U.S. $) | On Notice of commencement of principal photography | N/A |
| 80% (U.S. $) | On Delivery | L/C |

2.      After payment of Advance Rentals pursuant to Paragraph C1 above, such Rentals may, in accordance with the terms hereof, then be recouped by Lessee and deducted from any Rentals due to Lessor under Paragraphs E, F, and G below.  For this purpose, Gross and Net Receipts derived from the exploitation of all Rights shall be fully cross-collateralized for all purposes to recoup all Advance Rentals with respect to the Picture.

3.      ANY SECURITY INDICATED ABOVE SHALL, AS A MATERIAL COVENANT AND CONDITION HEREOF, BE DELIVERED TO LESSOR NO LATER THAN TEN (10) BUSINESS DAYS PRIOR TO THE START OF PRINCIPAL PHOTOGRAPHY OF THE PICTURE, UNLESS LESSOR SHALL OTHERWISE GIVE LESSEE CONSENT.

4.      Any "Letter of Credit" or "L/C" indicated above shall be a primary irrevocable, unconditional transferable letter of credit in a form approved by the Bank indicated below.  Any such L/C shall be issued and payable by a bank subject to Lessor's Right of Approval, and shall be CONFIRMED (at Lessor's request and at Lessee's expense) and ADVISED BY, and PAYABLE AT the counters of the Bank indicated below with the Bank as Beneficiary (or such other bank[s] as may be designated by Lessor by written notice to Lessee) and all Rentals and Advance Rentals shall be paid directly to such account:

[to be completed pursuant to Collection Agreement]

D.    EXPECTED DELIVERY DATE / MATERIAL ELEMENTS

1.      Expected Delivery Date.  Lessor shall make Delivery of the Picture in accordance with the terms hereof on or before:

("Expected Delivery Date").  However, the Expected Delivery Date may, at Lessor's option, be accelerated or extended for up to one hundred twenty (120) days.

2.      Material Elements.  The Picture shall embody the following creative elements ("Material Elements"), which shall be the only required creative elements in the Picture:

E.    THEATRICAL AND NON-THEATRICAL RENTALS

With respect to sums derived in connection with the Use of Theatrical Rights, Non-Theatrical Rights and Public Video Rights (if leased to Lessee hereunder), Lessee shall pay to Lessor the sums indicated below as Rentals.

60 % of Net Receipts until Lessee recoups the Advance Rentals [and 50% of Net Receipts to Lessor thereafter.]

F.  VIDEO RENTALS

With respect to Use of Video Rights (if leased to Lessee hereunder) Lessee shall pay to Lessor the sums indicated below as Rentals.

30 % of the Wholesale Price (the "Royalty Rate") of Videos embodying the Picture shipped to Wholesale Dealers and not returned. The Royalty Rate shall be reduced to 15 % of the Wholesale Price of Videos of the Picture which are shipped to Wholesale Dealers more than six (6) months after the Initial Video Release Date of the Picture at a Wholesale Price less than 50% of the Wholesale Price applicable on initial Video Release in the Territory of a majority of the Videos embodying other Motion Pictures shipped in the applicable Accounting Period. This reduced Royalty Rate shall apply to the reduced Wholesale Price in calculating Lessor's Rentals hereunder.

G.  TELEVISION AND ANCILLARY RENTALS

With respect to Use of Pay-Per-View Rights, Television Rights and Ancillary Rights to the extent leased to Lessee hereunder. Lessee shall pay to Lessor the sums indicated below as Rentals:

| Rights | Percentage of Gross Receipts | Percentage of Net Receipts |
|---|---|---|
| Pay-Per-View Rights | 75% | __% |
| Pay TV Rights | 75% | __% |
| Free TV Rights | 75% | __% |
| Ancillary Rights | 75% | __% |

H.  INITIAL DELIVERY MATERIALS

Initial Delivery Materials shall be:

A Laboratory Access Letter from the Laboratory substantially in the form of Schedule B or a fax authorization of the same tenor and purport.

I.  DELIVERY/NOTICE OF ASSIGNMENT

For purposes of this Agreement, "Delivery" shall occur when Lessor notifies Lessee that the Initial Delivery Materials are available for access or shipment to Lessee as more particularly described in the Standard Rental Terms. Lessee shall execute and deliver to Lessor's financing entity or bank a Notice of Assignment in the form of Schedule A to confirm Lessor's obligations hereunder. Lessor's obligation under the Notice of Assignment shall solely as between Lessee and the bank or financing entity, supercede the terms of this Agreement, but shall not be deemed a waiver of any of Lessee's rights against Lessor under the terms hereof.

J.  STANDARD RENTAL TERMS. This Agreement also includes and incorporates Lessor's Standard Rental Terms attached hereto and incorporated herein by this reference. Lessor may terminate this Lease at any time with no liability to Lessee if for any reason Lessor or its contractors and assignees do not produce the Picture or otherwise do not acquire the Rights in the Picture.

REVEREsalesagencyagrmnt
5-22-02

16

Very truly yours,

SEVEN ARTS INTERNATIONAL
("Lessor")

By _____

Its _____

AGREED AND ACCEPTED:

("Lessee")

By _____

Its _____

THIS AGREEMENT SHALL NOT BE EFFECTIVE OR BINDING UPON THE PARTIES HERETO UNTIL IT IS SIGNED BY BOTH PARTIES AND DELIVERED. LESSOR IS FREE TO WITHDRAW ANY OFFER TO CONTRACT AT ANY TIME PRIOR TO THE OFFEREE'S SIGNATURE AND DELIVERY OF THIS AGREEMENT AND OF ANY PAYMENT OR SECURITY DUE UPON SIGNATURE. IN ADDITION, THIS AGREEMENT AND LESSOR'S OFFER TO CONTRACT SHALL NOT BE EFFECTIVE OR BINDING UPON LESSOR UNTIL SIGNED BY A DULY AUTHORIZED AGENT OF LESSOR AT ITS PLACE OF BUSINESS OUTSIDE THE UNITED STATES. NO PROMISE, ORAL OR IN WRITING, TO SIGN THIS AGREEMENT SHALL BE BINDING UPON THE PARTIES. THE MANNER PROVIDED FOR HEREIN FOR THE MAKING OF THIS AGREEMENT IS EXCLUSIVE AND CONSTITUTES A CONDITION PRECEDENT TO THE FORMATION OF ANY CONTRACTUAL OBLIGATION BETWEEN THE PARTIES.

LIST OF ATTACHMENTS:

. Standard Rental Terms

Also included with the Standard Rental Terms are the following, to be used if applicable:

Schedule A – Notice of Assignment

Schedule B – Form Laboratory Access Letter

Schedule C – Form Letter of Credit ("L/C")

## SCHEDULE "A"
## NOTICE OF ASSIGNMENT

This Notice of Assignment (the "Agreement") is entered into as of _____ 2002, by and between _____ ("Distributor"), Cinevisions a California corporation ("Borrower"), Seven Arts International, a UK company ("Seven Arts") (Borrower and Seven Arts are collectively referred to herein as "Licensor"), and[       ] ("Financier"), in reference to the following facts:

A.      The Borrower and the Distributor entered into a distribution agreement dated as of _____ (that agreement and all other documents executed in connection therewith, as hereafter amended, modified, supplemented, the "Distribution Agreement"), pursuant to which the Borrower licensed to the Distributor certain rights with respect to a motion picture presently entitled "_____" (the "Film"). (Those rights, and any other rights, liens, mortgages, charges, and security interests of the Distributor, if any, in or with respect to the Film or any physical elements thereof, whether under the terms of the Distribution Agreement or otherwise being hereinafter collectively referred to as the "Distribution Rights")

B.      Under the terms of the Distribution Agreement, as amended hereby, the Distributor has agreed to pay the Borrower a total of US$ _____ (the "Minimum Guaranteed Payment") (no withholding taxes applicable) in the following installments, each installment being payable immediately upon satisfaction of all of the following conditions indicated for that installment:

(1)     US$ _____ (the "Pre-Delivery Deposit") upon the Distributor's execution and delivery of the Distribution Agreement; and

(2)     US$ _____, upon Delivery. "Delivery" means delivery to the Distributor of a notice stating that the Delivery Materials for the Film are available at an identified laboratory at the Distributor's sole cost and expense.

C.      For the purpose of securing the Borrower's obligations to the Financier under a Loan and Security Agreement ("Loan Agreement"), between the Borrower and the Financier, pursuant to which the Financier has lent money (the "Loan") to the Borrower to produce or acquire rights to the Film, the Borrower has granted to the Financier a first priority security interest in the Distribution Rights and all amounts payable by the Distributor under the Distribution Agreement (collectively, the "Distribution Agreement Proceeds", including the Minimum Guaranteed Payment.

D.      The parties hereto desire to determine their relative rights and obligations with respect to the Distribution Agreement, the Distribution Rights, and the Distribution Agreement Proceeds, and the priority of the Financier's security interests with respect thereto, in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows.

1.      Notice of Assignment.    The Borrower hereby notifies the Distributor as follows:

(a)     The Borrower has irrevocably assigned to the Financier (subject to the rights of the Bank hereunder and otherwise) all of the Distribution Agreement Proceeds.

(b)     The Distributor shall pay directly to the Financier the Distribution Agreement Proceeds in United States Dollars, as and when due, by wire transfer, at the bank account set forth below (or such other address or account as the Financier may designate in writing) until such time as the Distributor receives written notice from the Financier (the "Financier Notice") that all sums owing under the Loan Agreement have been indefeasibly paid in full and the obligation of the Financier to make loans thereunder have been terminated:

[to be completed]

(c)    The Borrower has granted to the Financier and its representatives (in lieu of the Borrower) the right to exercise and enforce all of its rights under the Distribution Agreement, including the rights of the Borrower under the Distribution Agreement to examine and audit the Distributor's books and records pertaining to the Film.

(d)    The Borrower hereby instructs the Distributor to furnish to the copies of all notices and statements (including all accounting statements) from the Distributor to the Borrower given under the Distribution Agreement.

(e)    The instructions and directions contained herein are coupled with an interest and are in all respects irrevocable and without right of rescission or modification, except (i) with the prior written consent of the Bank and the Completion Guarantor, or (ii) upon receipt of the Financier Notice.

(f)    Notwithstanding anything in the Distribution Agreement to the contrary, the Distributor may discharge its obligation to pay Distribution Agreement Proceeds only by paying all such amounts to the Financier in accordance with paragraph 1 hereof. The Distributor may not discharge that obligation by paying the Distribution Agreement Proceeds to the Borrower, the sales agent, or any other person. IF THE DISTRIBUTOR PAYS ANY OF THE DISTRIBUTION AGREEMENT PROCEEDS TO ANYONE OTHER THAN THE FINANCIER DESPITE THIS NOTICE, THEN THE DISTRIBUTOR WILL BE LIABLE TO THE FINANCIER FOR PAYMENT OF THOSE AMOUNTS EVEN IF THIS MEANS THAT THE DISTRIBUTOR MAY BE LIABLE FOR DOUBLE PAYMENT OF THOSE SUMS.

2.    Acceptance and Acknowledgement. Notwithstanding anything to the contrary contained in the Distribution Agreement, for the benefit of the Bank only, and without waiving any rights or remedies the Distributor may have against the Borrower, until such time as the Distributor receives the Financier Notice the Distributor hereby acknowledges, covenants, and agrees as follows:

(a)    The Distributor agrees to pay directly to the Financier all of the Distribution Agreement Proceeds in full and in strict accordance with Recital B hereof and the directions contained in paragraph 1 hereof notwithstanding any instructions of the Borrower, the sales agent, or any other person to the contrary.

(b)    The payment to the Financier of the Minimum Guaranteed Payment in full, as and when due hereunder, is a condition precedent to the grant to the Distributor of any of the Distribution Rights.

(c)    The Distributor's obligation to pay the Distribution Agreement Proceeds as set forth herein is conditioned only by Delivery being effected to the Distributor other than payment of the Pre-Delivery Deposit which is conditioned only on execution and delivery of the Distribution Agreement.

(d)    The Distributor waives, as to the Financier, all defenses to the payment of the Minimum Guaranteed Payment other than a failure to effect Delivery to the Distributor. All of the Distributor's defenses to the payment of the Minimum Guaranteed Payment are reserved by the Distributor as against the Borrower but only to the extent that the exercise of such rights does not derogate from the Bank's right to receive the Minimum Guaranteed Payment in full.

(e)    Distribution Agreement Proceeds paid to the Bank by the Distributor shall not be subject to refund or return by the Financier or to the Completion Guarantor for any reason whatsoever, except as expressly provided by this paragraph. If Delivery to the Distributor is not effected, then all of the Distribution Rights shall thereupon terminate and the Borrower shall refund the Pre-Delivery Deposit to the Distributor. The Borrower hereby agrees to indemnify and defend the Financier with respect to all claims made by the Distributor with respect to the Pre-Delivery Deposit.

(f)    (i) The Financier has taken an assignment only of the right to receive payment of the Distribution Agreement Proceeds, (ii) the Financier and the Completion Guarantor have not assumed any of the Borrower's obligations or liabilities under the Distribution Agreement, and (iii) the Distributor shall look solely to the Borrower for the performance and discharge of any such obligations and liabilities.

(g)     Any and all liens, mortgages, charges, and other security interests created by the Borrower or any of its predecessors-in-interest in the Financier's favor in or with respect to the Distribution Rights shall at all times be senior to and have priority over any and all of the Distributor's rights, liens, or entitlements to the Distribution Rights (all which are hereby subordinated to the Financier's and to the Completion Guarantor's security interests); provided, however, solely as among the Financier and the Distributor, and not for the benefit of the Borrower or any third party, the Financier, and the Borrower will not exercise their respective security interests or other rights in any manner that would materially and adversely prejudice, disturb, infringe upon, interfere with, prevent or impede the full, complete, free and unencumbered purchase, enjoyment, exploitation and exercise by the Distributor of the Distribution Rights provided that the Distributor has paid to the Financier the Minimum Guaranteed Payment in full as and when due under this Agreement and the Distributor is not otherwise in breach of its obligations under the Distribution Agreement.

(h)     The Financier has the right to terminate the Distributor's Distribution Rights if the Distributor defaults in any of its obligations under this Agreement, the Distribution Agreement, of any other agreement with the Financier or the Borrower, including any distribution agreement for any other film that has been pledged to the Financier or the related notice of assignment.

(i)     Notwithstanding anything to the contrary contained herein, if the Distributor or any of its sub-distributors releases (or authorizes the release of) the Film in any medium, then solely as between the Distributor and the Financier all conditions precedent to the payment of the Minimum Guaranteed Payment shall be conclusively presumed to have been satisfied and the Minimum Guaranteed Payment shall thereupon be immediately due and payable in full. Nothing in this Agreement shall relieve the Borrower of its obligations to deliver the Film to the Distributor in accordance with the terms of the Distribution Agreement.

(j)     The Distributor agrees that (i) the Financier did not make and does not make any representations or warranties, express or implied, concerning any matter concerning the Film (including the budget or the actual costs of the Film), the Distribution Rights, or any other matter, and (ii) the Financier has no duty to disclose any information to the Distributor concerning the Film, including but not limited to the amount of the budget for the Film or the actual production costs thereof.

(k)     The Distributor shall promptly notify the Financier of any claim by any other party that such party is entitled to receive any portion of the Distribution Agreement Proceeds.

3.     Representations and Warranties.     The Distributor represents and warrants as follows:

(a)     No person, other than the Financier has asserted any prior claims to the Distribution Agreement Proceeds.

(b)     The Distribution Agreement is and shall remain in full force and effect and the Distributor has all necessary power and has taken all action necessary to enter into this Agreement, upon its execution, this Agreement constitutes a valid, binding and enforceable obligation of the Distributor in accordance with its terms; and no consent, waiver or approval of any third party is necessary for the Distributor to enter into and perform this Agreement or consummate of the transactions contemplated hereby.

(c)     There are no agreements between the Distributor, the Licensor, and the Borrower concerning or mentioning the Distributor's right to distribute or exploit the Film, including all so-called "side agreements," other than the Distribution Agreement.

(d)     No Distribution Agreement Proceeds have been previously paid to the Borrower, the sales agent, or any other person.

4.     Amendments, Modifications, Waivers, and Termination.     Prior to receipt of the Financier Notice, neither the Borrower nor the Distributor has any authority, without the prior written consent of the Financier, to (and neither shall) (a) waive any provisions of or rights under the Distribution Agreement; (b) modify, amend or supplement the Distribution Agreement in any manner affecting the Distribution Agreement Proceeds; (c) terminate the Distribution Agreement; or (d) amend, modify or supplement the Distribution Agreement in any manner affecting Delivery.

5.    Reservation of Rights.    Notwithstanding anything to the contrary contained herein, as among the Borrower and the Distributor only, nothing contained herein shall relieve the Borrower of its obligation deliver the Film to the Distributor in accordance with the terms of the Distribution Agreement.

6.    Arbitration.    Notwithstanding anything to the contrary provided in the Distribution Agreement, the Borrower, the Distributor, the Completion Guarantor, and the Financier each agrees as follows:

(a)    All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Film or the Distribution Rights, this Agreement, or any resulting transaction, including, but not limited to, their respective obligations hereunder, payment of the Minimum Guarantee Payment and any other Distribution Agreement Proceeds a disagreement about the meaning, interpretation, application performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by binding arbitration conducted under the auspices of the American Film Marketing Association ("AFMA") in effect as of the date the request for arbitration is filed and its rules (the "Rules") and, to the extent not otherwise covered above, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code.

(b)    Each of the parties may initiate such an arbitration pursuant to the Rules. The arbitration shall be held in Beverly Hills or Los Angeles, California (such site being herein referred to as the "Forum"). The arbitration proceeding shall be conducted in the English language. The Borrower, Distributor, the Completion Guarantor, and the Bank shall abide by any decision rendered in such arbitration, and that any court having jurisdiction may enforce such a decision.

(c)    If applicable, the arbitration award shall determine whether Delivery to the Distributor has been effected. If there is such a finding, then the Distributor shall immediately pay the Minimum Guaranteed Payment to the Bank without asserting any defenses. The arbitration award shall also provide for payment by the losing party (i.e., the party or parties against whom an arbitration award is issued) of: (i) the fees and costs incurred in connection with said arbitration, as well as the reasonable attorneys' fees and costs incurred by the prevailing parties (i.e., all parties to the arbitration other than the losing party), and (ii) shall further provide for the payment by the losing party of interest on said award at the same interest rate payable by the Borrower to the Financier under the Loan Agreement, commencing on the date when the Conditions Precedent have been satisfied. The arbitrator shall immediately upon conclusion of the arbitration proceedings, render and issue a written decision. The parties intend that a final arbitration award is to be issued by no later than a date (the "Letter of Credit Delivery Date") that is not later than sixty-five days before the expiry date of the Letter of Credit (as hereinafter defined) so that the Financier does not lose the benefit of the Letter of Credit. The parties hereto agree and direct the arbitrator to conduct the arbitration proceeding without any delay and not permit any party to delay or frustrate the progress of the proceedings so that a final arbitration award is issued by no later than the Letter of Credit Delivery Date. Upon rendering a decision in favor of the Financier the arbitrator shall and execute and deliver to the Financier an original, signed certificate in the form of Exhibit "B-3" to the Letter of Credit.

(d)    Each of the parties hereto submits to the non-exclusive personal jurisdiction of the courts of the Forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award, and irrevocably waives any objection which it may now or hereafter have to the venue of any such enforcement proceeding brought in any of said courts and any claim of inconvenient forum. Each of the parties agrees that (i) service of process for all arbitration proceedings may be made in accordance with the Rules and (ii) service process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in the manner provided in paragraph 7 hereof and shall be deemed effective as provided therein. The Distributor hereby expressly waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

7.    Notices. All notices, statements, and copies thereof given hereunder must be given in writing at the addresses for the parties indicated below after their signatures, and must be delivered either by hand or by telecopier transmission (with a copy by registered or certified mail, return receipt requested). Notices shall be deemed to have been given when personally delivered (if by hand) or upon the earlier of confirmed telecopier receipt (if by telecopier), or five (5) days after dispatch by the sending party (if by mail).

8.   Long Form Agreement.  If the parties enter into any other agreement concerning the distribution of the Film, including a long-form version of the Distribution Agreement, the parties hereto agree that the terms of this Agreement shall remain in effect and supersede the terms of such other agreements to the extent they conflict with the terms hereof.

9.   Letter of Credit.  The Distributor shall deliver to the Financier a letter of credit in the form of Exhibit "B" attached hereto concurrently with its execution and delivery of this Agreement (the "Letter of Credit").  The Letter of Credit shall be issued by a bank approved by the Financier (or if it is not approved, then confirmed, at the Borrower's expense, by a financial institution approved by the Financier.  Delivery of the Letter of Credit to the Financier is a condition precedent to any rights that the Distributor may have with respect to the Distribution Rights.  Any funds received by the Financier upon a drawing on the Letter of Credit shall be applied to the Distributor's obligation to pay the Minimum Guaranteed Payment under the terms hereof.  The parties intend that a final arbitration award be issued by no later than a date ("Letter of Credit Delivery Date") the sixty-five days before the expiry date of the Letter of Credit so that the Financier does not loose the benefit of the Letter of Credit.  Accordingly, the parties hereto agree and direct the arbitrator to conduct the arbitration proceeding without any delay and not permit any party to delay or frustrate the progress of the proceedings so that a final arbitration award is issued by no later than the Letter of Credit Delivery Date.

10.   Closing Documents.  Concurrently with its execution and delivery of this Agreement to the Financier, the Distributor shall also deliver to the Bank all of the documents listed in Schedule 1 attached hereto which (to the extent applicable) have been duly executed and delivered by all the Persons specified therein.

11.   Miscellaneous.  This Agreement shall be governed by the laws of the state of California without regard to its conflicts of law rules.  Time is of the essence in the performance hereof.  No amendment to this Agreement shall be effective unless in writing and signed by each party hereto.  This Agreement may be executed in counterparts, each of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile shall be equally effective as delivery of a manually executed counterpart of this Agreement.  Any party delivering an executed counterpart by facsimile shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not effect the validity, enforceability, of binding effect of this Agreement, and the parties hereby waive any right they may have to object to said treatment.  This Agreement is controlling in the event of any conflict between the Distribution Agreement and this Agreement.  This Agreement is binding upon and shall inure to the benefit of the Financier, the Borrower, and the Distributor, and their respective successors and assigns.  This Agreement is intended by the parties hereto to be the final, complete, and exclusive expression of the agreement between them with respect to the subject matter hereof.  This Agreement supersedes any and all prior oral or written agreements relating to such subject matter

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.


"BORROWER"                              "DISTRIBUTOR"
CINEVISIONS


By:_____           By:_____
Its:_____          Its:_____

Address for notices:                    Address for notices:
9051 Oriole Way
Los Angeles, CA  90069
USA
Attention: Peter Hoffman                 Attention:
Fax. No. (310) 887-3840                  Fax:

"FINANCER"

By:_____
Its:_____

Address for notices:

"SEVEN ARTS"/"LICENSOR"
SEVEN ARTS INTERNATIONAL

By: _____
Its: _____

Address for notices:
12 Chiswick Lane
London W4 2JE
UNITED KINGDOM
Fax. No. 011 44 207 742 7666

SCHEDULE "B"                    FORM LABORATORY ACCESS LETTER

DATE:

LAB ADDRESS:

RE:    " " (the "Film")

Gentlemen:

You acknowledge that there are now on deposit with you certain preprint materials for the above-entitled motion picture (the "Film") as indicated on Exhibit 1 attached hereto or any comparable preprint materials substituted therefor (collectively the "Materials") from which commercially satisfactory 35mm release prints (and trailer prints as soon as they are available) may be manufactured. You are hereby instructed and directed that all Materials now or hereafter in your possession shall be held by you in the name, and for the account of, SEVEN ARTS INTERNATIONAL subject to Paragraph 2 below. You are hereby advised that Seven Arts International ("Lessor") has granted certain rights to distribute and exhibit the Film to _____ ("Lessee"). Accordingly, you are hereby irrevocably authorized and instructed to honor, subject to your customary terms such as satisfactory credit arrangements, all orders of Lessee, or its designees, successors, licensees or assignees for as many 16mm or 35mm color release prints of the Film, negative and other pre-print materials of the Film and trailers thereof, as Lessee may require and video sub-masters, sound and other items customarily manufactured from the Materials. This authorization will remain valid during the Term of lease of Rights including the Extended Term upon the following terms:

1.    Lessor shall, at all times, have complete and free access to all the Materials as well as all other materials and properties of the Film hereinafter in your possession or under your control, including the right to remove any or all of the Materials without any further approval by Lessee upon Lessor's delivering to Lessee a copy of a Laboratory Access Letter on terms substantially in accordance with this laboratory access letter and signed by the laboratory to which Lessor is transferring the Materials.

2.    All laboratory services and materials ordered by either Lessor or Lessee shall be at the sole cost and expense of the party ordering the same.

3.    It is understood and agreed that you are entitled to a lien on the materials relating to the Film now or hereafter in your possession or under your control for charges to work, labor and services rendered and materials furnished in connection with the Film and that nothing contained herein shall affect your rights and security interest in such materials. Notwithstanding the foregoing, you will not assert against Lessor or Lessee any lien at common law or under any applicable statute against any Materials relating to the Film by reason of any unpaid charges incurred by any other party, and you will not refuse to honor any orders of either party because of unpaid charges incurred by the other party.

4.    The Materials mentioned above shall not be removed from your laboratory without the prior written consent of Lessor or prior to delivering to Lessee a copy of a Laboratory Access Letter on terms substantially in accordance with this laboratory access letter and signed by the laboratory to which Lessor is transferring the Materials. The instructions contained herein are irrevocable without the written consent of Lessor, Lessee and may not be altered or modified except in a writing signed by Lessor.

Please confirm your agreement to the foregoing by signing below where indicated.

Very truly yours,

SEVEN ARTS INTERNATIONAL

By: _____
Its: _____

[or]

_____

By: _____
Its: _____

AGREED AND ACCEPTED:
[LAB]

By: _____
Its: _____

<u>Exhibit 1</u>

**Pre-print Materials:**

One (1) 35mm color reverse intermediate or internegative of the Picture, cut titled and assembled.

One (1) 35mm optical soundtrack negative of the English Language version of the Picture.

One (1) 35mm color reversal intermediate or internegative of the backgrounds to the main credits, insert and end titles of the Picture and of photographic overlay titles thereof.

One (1) M & E Track for the Picture.

**SCHEDULE C**
**FORM LETTER OF CREDIT**

ISSUING BANK:
[Insert name and address of issuing bank]
TELEX: _____
SWIFT: _____

APPLICANT:
[Insert name and address of distributor]

BENEFICIARY:
[Insert name and address of bank]
TELEX:
SWIFT:

We hereby issue in favor of the above-mentioned beneficiary this irrevocable transferable documentary credit, which is available with us by payment at sight against presentation of the documents detailed herein.

Date and Place of Expiry: _____, Los Angeles, California

CREDIT AMOUNT: US$_____

REFERENCE:

Certain distribution and exploitation rights in the picture currently entitled _____ pursuant to a contract dated as of _____, between _____, as licensee, and Seven Arts International, as licensee ("Distribution Agreement").

DOCUMENTS REQUIRED:

1.     One sight draft, purportedly executed by beneficiary and drawn on us bearing the clause, "Drawn under irrevocable letter of credit number _____";

2.     An original certificate, purportedly signed by [name of borrower] or by [name of borrower], as attorney in fact for [name of borrower], substantially in the form of Exhibit "A" attached hereto and incorporated herein; and

3.     An original copy of a laboratory access letter purportedly executed by [name of borrower] or Imperial Bank, as attorney in fact for [name of borrower], substantially in the form of Schedule "B" attached hereto and incorporated herein by reference.

ADDITIONAL CONDITIONS:

Article 43 of the UCP 500 do not apply to this Letter of Credit.

Third party documents acceptable. A reprographic copy of a document with an original signature shall be treated as an original document for purposes of a drawing under this letter of credit.

Exhibit "A" and Schedule "B" hereto form an integral part of this Letter of Credit.

Partial drawings are not permitted.

Extending of Letter of Credit expiry date until _____ is acceptable upon payment of an additional cost in the amount of US$ _____ by beneficiary to account of _____, with us who must have received the remittance latest on or before _____. Funds under this Letter of Credit are available to you with ourselves by

payment against your sight draft drawn on us accompanied by all of the required documents. Any sight draft drawn under this credit must bear on its face the clause 'drawn under [insert name of issuing bank]'.

All commissions and charges arising under this credit are to be borne by the beneficiary except ours.

This documentary credit is subject to Uniform Customs and Practice for Documentary Credit (UCP), 1993 revision, International Chamber of Commerce Publication No. 500.

Upon receipt of credit conform documents we shall cover you according to your instructions.

We hereby engage with you that all drafts drawn under and in compliance with the terms of this credit will be duly honored if drawn and presented for payment at this office on or before the expiration date of this letter of credit.

INSTRUCTIONS FOR ADVISING BANK:

We request you to notify the credit to the beneficiary without adding your confirmation.

Please advise beneficiary by phone and by fax.

Please send the documents in one set to us by courier to:
[Insert name of bank]
[INSERT ADDRESS]

Please always quote our above-mentioned reference.

REVEREsalesagencyagmnt
5-22-02

11

EXHIBIT "A"
TO
LETTER OF CREDIT
CERTIFICATE

DATE:

Re:        (the "Film")

      The undersigned has given _____ a notice stating that a film laboratory in the United States is holding an internegative of the Film in the original English language version, that is sufficient to manufacture first-class technical quality release prints and materials therefrom and that upon receipt by such laboratory of payment by such distributor for the manufacturing and shipping costs, such laboratory will manufacture and ship such prints and materials to the distributor.

      [name of borrower] or [ _____ Bank as attorney in fact for [name of borrower]]

By: _____

Print Name: _____
Its: _____

## STANDARD RENTAL TERMS

1.    Definitions

The following terms indicated herein by initial capitalization shall have only the following meanings for purposes of this Agreement (including the Schedules), and the provisions set forth in these definitions shall be an integral part of the Agreement and shall have the same force and effect as any other provisions hereof.

1.1.    "Accounting Period" and "Statement" mean the periods and statements described in Paragraph 4.1 of the Standard Rental Terms.

1.2.    "Additional Items" means the materials referred to in Paragraph 2.2 of the Standard Rental Terms.

1.3.    "Advertising Materials" means the materials described in Paragraph 3.1B of the Standard Rental Terms.

1.4.    "Advance Rentals" means sum(s) due to Lessor as provided in Paragraph C of the Cover Letter as in fact paid by Lessee to Lessor (expressly excluding any sums payable under any other agreement between Lessor and Lessee or any of their respective Affiliates, whether or not relating to the Picture). All video Rentals shall be non-returnable and shall not be repayable to Lessee for any reason whatsoever, except as hereinafter expressly provided.

1.5.    "Affiliate" means any Person owned or controlled by, controlling or under common control with Lessor or Lessee as the case may be. For purposes of this Agreement, ownership directly or indirectly of 50% of 100% or more of the voting stock and/or other voting equity security of a Person shall be deemed "control."

1.6.    "Agreement" means all of the Cover Letter, the Standard Rental Terms and all Schedules, and all references to "herein," "hereunder" or "hereof" shall refer to the entire Agreement . In the event of any conflict between or among (i) the Cover Letter and the Standard Rental Terms or Schedules, the Cover Letter shall prevail, and (ii) any Schedule and the Standard Rental Terms, the applicable Schedule shall prevail.

1.7.    "Ancillary Rights" mean:

A.    "Ancillary Rights", if leased to Lessee, means any Use of Airline, Ship and Hotel Rights of a Motion Picture.

B    "Airline Rights", if leased to Lessee; means Use of a Motion Picture Copy only for direct exhibition in airplanes, wherever located, which are operated by an airline flying the flag of any country in the Territory for which the Airline Rights are granted, but excluding airlines which are only serviced in but do not fly the flag of a country in the Territory.

C.    "Ship Rights", if leased to Lessee, means Use of a Motion Picture Copy only for direct exhibition in ocean going vessels, wherever located, which are operated by a shipping line flying the flag of any country in the Territory for which Ship Rights are granted, but excluding shipping lines which are only serviced in but do not fly the flag of a country in the Territory.

D.    "Hotel Rights", if leased to Lessee, means the Use of a Motion Picture Copy only for direct exhibition in temporary or permanent living accommodations such as hotels, motels, apartment complexes, cooperatives or condominium projects by means of closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living accommodations.

1.8.    "Artist Identification" means the name or any photograph, likeness, silhouette, signature, reproduction of voice or sound effects, mannerisms or other identification of any Person rendering services in connection with the Picture.

1.9.    "Cinematic Rights" mean:

A.    "Cinematic Rights", if leased to Lessee, means Theatrical, Non-Theatrical and Public Video Rights in a Motion Picture.

B.    "Theatrical Rights", if leased to Lessee, means Use of a Motion Picture Copy only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, which are open to the general public on a regularly scheduled basis and which charge an admission fee to view the Motion Picture Copy.

C.    "Non-Theatrical Rights", if leased to Lessee, means Use of a Motion Picture Copy only for direct exhibition by means of any Print or Video before an audience by and at the facilities of (i) either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or (ii) governmental bodies such as in embassies, military bases, military vessels, and other governmental facilities flying the flag of any country in the Territory. By way of clarification but not limitation, Non-Theatrical Rights do not include Video, Public Video, Airline, Ship or Hotel Rights.

D.    "Public Video Rights", if leased to Lessee, means Use of a Motion Picture Copy embodied in a Video only for direct exhibition before an audience in a "mini-theater", an "MTV theater" or like establishment which charges an admission to use the viewing facility or to view the Video and which is not licensed as a traditional motion picture theater in the place where the viewing occurs.

1.10.    "Cover Letter" means the basic terms and conditions of the Agreement as set forth in the document executed by the parties to which these Standard Terms are attached.

1.11.    "Delivery" of the Picture means performance by Lessor as defined in Paragraph 2.1 of these Standard Rental Terms.

1.12    "Delivery Date" of the Picture means the date of Delivery of the Picture in accordance with Paragraph 2.1 of these Standard Rental Terms.

1.13.    "Distribution Expenses" means the following out-of-pocket expenses directly related to the Picture, which are paid by Lessee or its Affiliates to third parties in arm's-length transactions, after any allowances, rebates or discounts received by Lessee or its Affiliates:

A.    Manufacturing Costs of positive prints and trailers of the Picture, including duplication costs and material costs, if any, such as the manufacturing of tapes.

B.    Advertising and publicity in connection with the distribution of the Picture.

C.    The preparation and exploitation of bill posters, lithographs and other permitted advertising accessories (i.e., materials sold or leased to theaters for marquees, front and lobby display) relating to the Picture.

D.    Subtitling, dubbing, editing, censorship fees, and costs of editing to meet censorship requirements, all to the extent such costs have been expended in conformity with these Standard Rental Terms.

E.    Customs duties and import taxes of the Territory on the Picture and permits necessary to secure the entry of the Picture into the Territory, and all Taxes set forth in Paragraph 4.B assessed solely with respect to the distribution of the Picture or on Gross Receipts derived solely from the Picture.

F.    Shipping Costs of prints, pre-print material or other physical properties of the Picture, including the costs of returning material to Lessor, as well as the cost of shipping within the Territory.

G.    Costs incurred to check reports from Percentage Engagements of the Picture.

H.    Distribution Expenses shall not include (i) Lessee's or any Affiliates' general and administrative expenses nor any salaries or fees otherwise paid by Lessee to an Affiliate (nor by one Affiliate to another

Affiliate); (ii) amounts paid to other Persons for general and administrative or "backroom" services provided by a distributor; (iii) any general promotion and advertising expenses such as costs incurred at sales conventions or festivals; or (iv) travel, lodging and entertainment costs, except those directly related to the publicizing of the Picture to potential customers.

I.    All costs incurred and actually paid in connection with the collection of monies, including reasonable fees of attorneys and auditors.

J..   To the extent not paid by Lessor, the cost of all licenses required to permit exhibition, distribution or other use of the Picture and trailer, including fees for use of any patents, equipment or processes, synchronization, recording and performing royalties and fees, as well as re-use fees and costs advanced by Lessee on behalf of Lessor pursuant to collective bargaining agreements, law or government regulations or industry protocols.

K.    To the extent not paid by Lessor, all costs for insurance coverage of any and all risks, including loss or damage to motion picture copies and physical materials.

L.    Cost to protect the copyright ownership in the Picture and to prevent infringement or violation of rights in connection therewith, including reasonable attorneys fees.

M.    To the extent not previously paid by Lessor, all payments of mechanical, performance, synchronization or similar royalties to local performing or author's rights societies for use of a composition within the Territory.

N.    Payments pursuant to collective bargaining agreements laws or government regulations or industry protocols to organizations such as NVF, NFC, BUMA/STEMRA and alike.

O.    Charges for macrovision or similar antipiracy devices, if any.

1.14.    "Distribution Fee" means the share of Gross Receipts indicated in the Cover Letter, if any.

1.15.    "Dubbing Materials", "Dubbed Track" and "Other Materials" mean the materials so described in Paragraph 2.3 of the Standard Rental Terms.

1.16.    "Gross Receipts" means all gross monies, advances or other consideration due to Lessee from any Use, and from any agreements for Use, of the Rights without any deduction or diminution of whatsoever kind or character (other than discounts, rebates, and other similar allowances) plus any sums allowed to exhibitors or other Persons (other than other distributors) to be expended in connection with any Use of the Picture if such sums are deducted or applied in reduction of sums due to Lessee. All amounts not received by reason of bad debts or uncollectible amounts shall be excluded from Gross Receipts for all purposes hereunder and accounting reports (and payments when due) should be made on the basis of actually received amounts only and not on the basis of invoiced amounts. For avoidance of doubt, Gross Receipts shall include all gross monies, advances and other consideration for the Use of Advertising Materials. All Gross Receipts shall include any consideration due to an Affiliate of Lessee with respect to the Picture if derived from the Use and from any agreements for Use of Rights by the Affiliate as a distributor or subdistributor in the Territory. All Gross Receipts shall upon receipt by Lessee or an Affiliate be the property of Lessor and Lessee, as their interests may appear.

1.17    "Holdback Period" shall mean the period designated in the Cover Letter during which Lessee shall not, as a material term of this Agreement, Use the Rights so designated (other than Incidental Rights defined in Paragraph 1.18F). The Holdback Period shall commence on the commencement of the Term and shall end at the expiration of the period of time set forth in the Cover Letter opposite the Rights to which each Holdback Period applies.

1.18.    "Incidental Rights" means the following incidental rights to be exercised only (i) in connection with the exercise of the Rights (ii) in the Languages (iii) in the Territory (iv) during the Term and (v) subject in all instances to all exclusions, restrictions and limitations set forth herein:

A.    The right to perform by Use of the Picture and Advertising Materials any and all music, lyrics, scores and musical works embodied in or synchronized with the Picture and/or with the soundtrack thereof ("Music") only as synchronized with and embodied in the Picture as Delivered to Lessee; provided, however that Lessee shall hold a valid license by, and shall pay or cause to be paid all royalties or license fees to, any performing rights society or association for the performance of Music required under any law, regulation or prevailing custom and practice in the Territory, and shall indemnify and hold Lessor harmless therefrom. The Rights are subject in all respects to all rights of composers, authors, music publishers and performing rights societies with respect to the Music, and Lessee shall not permit or authorize any Use of any Picture under such circumstances or in such places as may constitute an infringement of any performance or other rights in any Music.

B.    The right to use the title or titles of the Picture.

C.    The right in the ordinary course of business to exercise or authorize others to exercise the Rights under any such terms and in such manner as Lessee may deem appropriate in Lessee's reasonable business judgment.

D.    The right to make and use dubbed and subtitled versions of the Picture and the trailers thereof, including but not limited to cut-in, synchronized and superimposed versions thereof, subject to all third party restrictions to which Lessor's rights may be subject.

E.    The right to permit commercial messages to be broadcast or telecast before, during and after the Use of Television Rights in the Picture.

F.    The right to publicize and advertise the Picture and to cause or permit others to do so by Use of Advertising Materials and, without limiting the generality of the foregoing, the Incidental Rights shall include solely for purposes of advertising and publicizing the Picture:

(i)    The right to publish or cause or permit to be published, and in such form as Lessee may deem advisable, synopses, summaries, resumes or abridgements of the Picture (not exceeding, however, 7,500 words in length) in newspapers, heralds, magazines, trade periodicals, comic books, programs, booklets, posters, lobby displays, press books and other publications and in all other media of advertising and publicity.

(ii)    The right to broadcast or license or authorize others to broadcast by radio or television adaptations, versions or sketches of the Picture or any parts or portions thereof, from sound records, with living persons or otherwise, but not to exceed five (5) minutes in running time and in no event serially.

(iii)    The right to Use any Artist Identification provided by Lessor to Lessee.

G.    The right to assert and prosecute all claims, demands or causes of actions against any and all Persons for the unauthorized or illegal Use in the Territory of any Rights granted hereunder of the Picture, any part or versions thereof or any materials upon which the Picture is based and to otherwise enforce, protect and defend all or any Rights.

1.19.    "Internet Rights" means any Use by exhibition, broadcast, or transmission over what is commonly known as the internet or world wide web, an intranet, or multi-node computer network by any means, including satellite or over coaxial or fiber-optic cable, in such a manner as to permit viewing the complete Motion Picture on video displays (including television monitors) without alteration of the original continuity of, or sequence of images comprising, the Picture. Internet Rights shall be limited to Use (including transmission via servers) within the Territory to intermediate or ultimate users in the Territory by technical means which prohibit access (either directly or indirectly) to any person or technical means outside the Territory and which do not, without Lessor's Consent, permit the image to be stored or copied by an intermediate or ultimate user except for the purposes of: (i) retransmission of the Motion Picture to ultimate users in the Territory (in the case of an intermediate user); or (ii) facilitating a single viewing of the Picture (in the case of an ultimate user). For clarity, Lessor expressly reserves the right to Use Internet Rights outside of the Territory, provided that such exploitation shall be limited to transmission (including transmission via servers) outside the Territory to intermediate or ultimate users outside the Territory by technical means which prohibit access (either directly or indirectly) to any person or

technical means in the Territory and which do not, without Lessee's prior written approval, permit the image to be stored or copied by an intermediate or ultimate user except for the purposes of: (i) retransmission of the Picture to ultimate users outside the Territory (in the case of an intermediate user); or (ii) facilitating a single viewing of the Picture (in the case of an ultimate user).

1.20.     "Initial Delivery Materials" means the materials so described in the Cover Letter.

1.21.     "Laboratory" shall mean a film or sound laboratory designated by Lessor.

1.22.     "Languages" means the spoken or written languages in general use in the Territory or otherwise specified in the Cover Letter.

1.23.     "Letter" means the laboratory access letter (if any) attached as Schedule B.

1.24.     "Lessor's Consent" means Lessor's clear statement that it has approved a particular matter. Lessor's Consent shall be deemed given only if in a writing received hereunder in advance of consummation of the matter as to which Lessor's Consent is requested and only after Lessee shall have requested in writing Lessor's Consent. Lessor's Consent given in one particular instance shall not be deemed a waiver or implied consent to any other instance whether or not similar. Lessor's Consent may be withheld for any reason or arbitrarily as Lessor shall determine in its sole discretion.

1.25.     "Manufacture Costs" of any material means all costs and expenses charged or incurred for the duplication of the applicable material, including without limitation all laboratory and technical costs and all costs of any Person performing services, whether artistic or technical, in connection with manufacture of the applicable materials, expressly including locally required residuals.

1.26.     "Motion Picture" means an audiovisual work consisting of a series of related images which, when shown in succession, impart an impression of motion, with accompanying sounds, if any.

1.27.     "Motion Picture Copy" means the embodiment of a Motion Picture in any physical form, including film, tape, cassette or disc. Where a specific medium is limited to exploitation by specific physical form, for example, to exploitation of Video, then Motion Picture Copy with respect to such medium is limited to such physical form.

1.28.     "Net Receipts" means Gross Receipts from the particular Rights less Distribution Expenses from the Use of those Rights only.

1.29.     "Notice" means a notice given in accordance with the terms of Paragraph 6.1 of the Standard Rental Terms.

1.30.     "Notice of Assignment" means the notice of assignment attached on Schedule A.

1.31.     "Person" shall mean any natural person or any firm, corporation, association, partnership, organization or other enterprise organized or operating under the laws of any jurisdiction.

1.32.     "Picture" means only the complete motion picture listed by working title in the Cover Letter. For avoidance of doubt, the Picture shall not include any other motion picture which may embody up to ten (10) minutes of regular running time of motion picture photography appearing in or created for use in the Picture or which constitutes a remake or sequel of the Picture.

1.33.     "Printing Materials" means the materials so described in Paragraph 2.3 of the Standard Rental Terms.

1.34.     "Prints" shall mean release prints embodying the applicable Picture. Prints for exercise of Theatrical Rights shall mean 35mm or larger release prints, and 16mm gauge release prints if such gauge is regularly used in the legitimate exercise of Theatrical Rights in the Territory. Any Prints delivered by Lessor hereunder shall embody a soundtrack in the English language and shall be of good commercial quality but may be new.

1.35.    "Release Date" means first date of Initial Theatrical Release in the Territory as referred to in Paragraph 3.2A of the Standard Rental Terms.

1.36.    "Rentals" means the sums due to Lessor pursuant to Paragraph E, F, G of the Cover Letter.

1.37.    "Right of Approval" means a right on the part of Lessor to disapprove on reasonable grounds and thereby prevent a particular action of Lessee. Lessor's Right of Approval shall be deemed exercised and Lessor's disapproval given if and only if Lessor shall give Notice to Lessee that it disapproves a particular matter within ten (10) business days after Lessee shall give Notice to Lessor requesting approval of the applicable matter. Lessor's disapproval shall be deemed exercised on a matter and a disapproval given should Lessee fail or refuse in violation of the terms hereof to give Notice to Lessor that Lessor's approval of a particular matter is requested. As to any matter of which Lessor has a Right of Approval, it is understood and agreed that the parties shall not act with respect to such Right of Approval in a manner that would frustrate the intent of this Agreement, and in the event of an *impasse* the decision of Lessor made in good faith as to such matter shall be binding and controlling.

1.38.    "Rights" means any or all rights, licenses or privileges, under copyright or otherwise, to Use the Picture. All Rights leased to Lessee shall be exercised only in the Territory during the Term in the Languages. All Rights shall be exclusive to Lessee during the Term except as provided herein. All Rights and Incidental Rights not specifically leased to Lessee hereunder are expressly reserved to and retained by Lessor and may be freely exercised at any time and by any manner or means except as may be otherwise specifically provided herein. In particular, Lessee acknowledges that there are no limitations or "holdbacks" on Lessor's right to Use Video Rights at any time, except as may be provided in the Cover Letter. Without limiting the generality of the foregoing, the good will and value of the Picture, the characters, story, ideas, titles and other intellectual property relating to the Picture shall remain as between Lessor and Lessee the sole and exclusive property of Lessor. Lessee shall obtain no merchandising or publication rights by reason of this Lease.

1.39.    "Schedules" means the Schedules attached hereto, all of which are incorporated herein by this reference as if set forth in full. All capitalized or defined terms used in the Schedules shall have the meanings set forth herein and the Schedules shall be deemed a part of this Agreement for all purposes.

1.40.    "Security" shall be any bank letter, letter of credit, or other security for performance set forth in the Cover Letter. All Security shall be delivered or established on or before 20 days prior to commencement of principal photography of the Picture except as may be otherwise set forth in the Cover Letter or with Lessor's Consent.

1.41.    "Shipping Costs" means all costs and expenses customarily incurred or charged for the transportation of any applicable materials, including without limitation packing, insurance, international freight, taxes, customs duties, carnet, handling fees, and other similar items.

1.42.    "Television Rights" mean:

    A.    "Television Rights" means all Use of Free TV, Pay TV and Pay Per View Rights in a Motion Picture originating in and intended to be received only in the Territory. Television Rights do not include Video Rights, and no Use of any Picture originating outside the Territory but received in the Territory in an encrypted form or by re-broadcast or cable cast over which Lessor has no control shall be deemed to violate or infringe any Television Right granted to Lessee hereunder. Similarly, Lessor acknowledges that Use of the Picture (whether terrestrial, satellite or other forms of broadcast) which originate within the Territory may be capable of reception outside the Territory, and that such reception outside the Territory shall not be deemed a breach of this Agreement by Lessee provided that: (i) such broadcasts are dubbed in the Language, or (ii) with respect to the original language version of the Picture (if the original language is a Language) and/or subtitled versions of the Picture, such broadcasts are intended for primary reception within the Territory and are either (a) encrypted, or (b) capable of reception by no more than an insubstantial number of households outside the Territory.

    B.    "Free TV Rights", if leased to Lessee, means Use of the Picture by all forms of Terrestrial Free TV, Cable Free TV, and Satellite Free TV exploitation of a Motion Picture.

    C.    "Terrestrial Free TV Rights", if leased to Lessee, means only Use of the Picture by all forms of standard over-the air broadcast by means of Hertzian waves or digital encoded frequencies of a Motion Picture Copy

which is intended for reception on a television receiver in private living accommodations without a charge being made to the viewer for the privilege of viewing the Motion Picture. For purposes of this definition, neither governmental television receiver assessments or taxes will be deemed a charge to the viewer.

D. "Cable Free TV Rights", if leased to Lessee, means only Use of the Picture by all forms of the transmission by means of coaxial or fiber-optic cable of a Motion Picture Copy for reception on a television receiver in private living accommodations without a charge being made to the viewer for the privilege of viewing the Motion Picture. For purposes of this definition, neither governmental television receiver assessments or taxes, nor the regular periodic service charges (other than a charge paid with respect to Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

E. "Satellite Free TV Rights", if leased to Lessee, means only Use of the Picture by all forms of the up-link transmission of a Motion Picture Copy to a satellite and its down-link transmission to a terrestrial satellite reception dish for the purpose of viewing of the Motion Picture on a television receiver in private living accommodations which is located in the immediate vicinity of the reception dish without a charge being made to the viewer for the privilege of viewing the Motion Picture. For purposes of this definition, neither governmental television receiver assessments or taxes will be deemed a charge to the viewer.

F. "Pay TV Rights", if leased to Lessee, means Use of the Picture by all forms of Terrestrial Pay TV Rights, Pay-Cable TV Rights and Satellite Pay TV Rights exploitation of a Motion Picture. Pay TV does not include any Pay-Per-View Rights.

G. "Terrestrial Pay TV Rights, if leased to Lessee, means only Use of the Picture by all forms of standard over-the air broadcast of any Motion Picture Copy by means of encoded Hertzian waves for reception on a television receiver in private living accommodations by means of a decoding device where a charge is made: (i) to the viewer for the right to use the decoding device for viewing any special channel which transmits the Motion Picture along with other programming; or (ii) to the operator of a hotel, motel, apartment complex, cooperative, condominium project or similar place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

H. "Cable Pay TV Rights, if leased to Lessee, means Use of the Picture by all forms of transmission or retransmission of a Motion Picture Copy by means of an encoded signal over coaxial or fiber-optic cable for reception on a television receiver in private living accommodations by means of a decoding device where a charge is made: (i) to the viewer for the right to use the decoding device or viewing any special channel which transmits the Motion Picture along with other programming; or (ii) to the operator of a hotel, motel, apartment complex, cooperative, condominium project, or similar place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

I. "Satellite Pay TV Rights", if leased to Lessee, means Use of the Picture by all forms of up-link transmission of a Motion Picture Copy by means of an encoded signal to a satellite and its down-link transmission to a terrestrial satellite reception dish and a decoding device for the purpose of viewing the Motion Picture on a television receiver in private living accommodations which is located in the immediate vicinity of the reception dish and decoding device where a charge is made: (i) to the viewer for the right to use the decoding device for viewing a special channel which transmits the Motion Picture along with other programming; or (ii) to the operator of a hotel, motel, apartment complex, cooperative, condominium project, or similar place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

J. "Pay Per View Rights" if leased to Lessee means Use of Television Rights for a Motion Picture for any form of terrestrial, satellite, or cable broadcast or transmission that is an "Encoded Scheduled Playdate" or "Video On Demand". Internet Rights shall not be deemed Pay Per View Rights. An "Encoded Scheduled Playdate" shall be any Use of Television Rights of a Motion Picture solely in an encoded signal for which the viewer or a business establishment on behalf of the viewer pays a fee solely for the right to view the Motion Picture at a time scheduled by the broadcaster or transmitter of such Motion Picture for all viewers who wish to view the Motion Picture at that time, without regard to how many times or how frequently such schedule times occur ("Per View

Fee"). "Video on Demand" shall be Use of Television Rights for a Per View Fee but with no scheduled airtime, i.e. the viewer chooses the time at which the Motion Picture is viewed. Use of Video on Demand Rights shall be subject to Lessor's Consent.

1.43.    "Term" means the period of time set forth in Paragraph A of the Cover Letter.

1.44.    "Territory" means the nation(s) and territory(ies) listed by name in Paragraph A of the Cover Letter. "Territory" shall include armed forces installations of nations of the Territory, irrespective of where such installations are located, but "Territory" shall not include, and Lessor reserves all Rights for, armed forces installations of any nations or countries (including the United States) which are not of the Territory but which installations are located within the Territory. Should the political boundaries of the Territory be changed during the Term, the Territory shall not be expanded or limited but remain the geographical area of the Territory on execution hereof, and this Agreement shall otherwise continue on the same terms. Unless otherwise indicated in the Cover Letter, the Territory shall not include colonies, territories or possessions of the nations or countries listed in the Cover Letter.

1.45.    "Use," when used as a noun, means any exhibition, broadcast, transmission, publication or other exercise which may be made of any particular rights, materials or property, tangible or intangible, as the context may require. When referring to the Rights or any Incidental Rights, the term "Use" shall mean only such Uses as are embraced in the definition of the applicable Right or Incidental Right.

1.46.    "Video Rights" mean:

A.    "Video Rights", if leased to Lessee, means the Right to manufacture, distribute, rent and sell Videocassettes and/or Video Discs as designated in the Cover Letter embodying the Picture, in the format(s) designated in The Cover Letter, which enables a motion picture to be perceived visually when displayed through or as part of any electronic, mechanical or other apparatus (such as a television-type playback system) and primarily intended for private non-commercial use. Video Rights do not include Theatrical, Non-Theatrical or Television Rights. Notwithstanding anything to the contrary contained herein, unless expressly granted as "Public Video Rights", the rights granted to Lessee hereunder do not include the right to use or permit the use of any Videos for viewing in any place of public assembly, for broadcast by commercial-free or pay television or cable television (whether basic or pay), STC or for theatrical exhibition, or for broadcast or exhibition in hotels, military camps and installations, oil rigs, aircraft, educational institutions, hospitals or by other so-called "non-standard" or "non-theatrical" means, whether known or hereafter devised. The rights granted hereunder are solely for the individual, private, in-home viewing of Videos where no fee is charged to any viewer of such exhibition. Lessee shall not authorize any Video sold or otherwise distributed by Lessee to be exported out of the Territory. Lessor shall not authorize any video sold or otherwise distributed by Lessor to be imported by Lessor or third parties in the Territory. In addition, Lessee may not retain for its own use, nor in any manner dispose to third parties, any "free" or promotional Videos without Lessor's Right of Approval, or as permitted in this Agreement.

B.    "Video" shall be all Motion Picture Copies in the form of:

(1)    "Videocassettes" which shall mean a VHS or Beta cassette or electronic storage device in any authorized format designed to be used in conjunction with a reproduction apparatus which causes a Motion Picture to be visible on the screen of a television receiver. A Videocassette does not include any type of Video Disc.

(2)    "Video Discs" which shall mean any laser or capacitance disc or other form of mechanical storage device designed to be used in conjunction with a reproduction apparatus which causes a Motion Picture to be visible on the screen of a television receiver. A Video Disc does not include any type of Videocassette.

2.    Delivery of Picture

2.1.    A.    Delivery shall be deemed to occur upon Lessor's written Notice to Lessee that the Initial Delivery Materials are available for physical delivery to Lessee or for access pursuant a Letter, whichever may be applicable under the terms of the Cover Letter.

B.     Within thirty (30) days after Lessor gives notice to Lessee that Lessor is prepared to deliver the Picture, Lessee shall send to Lessor a written order for whatever number of Prints (or other Initial Delivery Materials as provided for in the Cover Letter) and quantity of trailers relating to the Picture that Lessee may require. Lessor will send to Lessee a pro forma invoice setting forth the actual cost (less any discounts or allowances, F.O.B. place of shipment), of such materials and Lessee shall pay such cost to Lessor in the currency invoiced. Promptly after receipt of such payment, Lessor shall deliver such materials to Lessee by delivering them to a common carrier for shipment to Lessee.

2.2.     Delivery of the Picture shall be deemed complete for all purposes hereunder upon Lessor's compliance with the terms of Paragraph 2.1 above. In addition to Delivery, Lessor shall make available to Lessee as soon as practicable the following additional items to the extent available to Lessor ("Additional Items"):

A.     If requested by Lessee and not included in any Letter, one (1) Print or Videocassette of the theatrical trailer of the Picture in the English Language.

B.     If requested by Lessee and not included in any Letter, one (1) Beta videomaster of the theatrical and (if available) US television version of the Picture in the English Language.

C.     If requested by Lessee, one copy of (i) a synopsis of the Picture and (ii) either (a) a shooting script of the Picture or (b) a dialogue list, as Lessor may choose, all of the foregoing being in the English language.

D.     One copy of a music cue sheet for the Picture.

E.     One copy of the screen and advertising credits ("Credit Schedule") to be used in connection with the Picture, including information as to the requirements and restrictions pertaining thereto, and one copy of a specimen advertising lay-out illustrating advertising credits with relative size and prominence in percentages.

F.     If requested by Lessee, and if available, one copy of a one-sheet advertising poster with respect to the Picture created by Lessor for use in the United States.

G.     If requested by Lessee, twenty-four different black and white and twenty-four different color photographs suitable for use in advertising the Picture, with a caption identifying the players and the scene in the Picture.

H.     One (1) trailer element, no later than six (6) months after Delivery.

I.     If requested by Lessee, and if available, any other Advertising Materials created by Lessor for Use in the United States, such as trailers, television and radio teasers, color slides and press kits, which may be ordered in writing by Lessee.

2.3.     A.     If this Agreement provides that the Initial Delivery Materials include a Music and Effects Track as defined below and a Print of the Picture (the "Dubbing Materials"), such Materials shall be used solely to produce a soundtrack ("Dubbed Track") of the Picture dubbed in the Language or Languages (other than English) specified in the Cover Letter, which is suitable for manufacture of Prints and trailers of the Picture dubbed in the Language(s).

B.     A Music and Effects Track shall be, both for the Picture and any trailers thereof, one (1) 35mm triple track (2-stripe) magnetic master of the English language soundtrack containing separate mixed music and mixed effects.

C.     All dubbing shall be of first-class quality, and shall be strictly in accordance with such requirements of which Lessor advises Lessee. Lessor may, at its election given by Notice to Lessee and at Lessor's expense, supervise and/or do the mixing, sweetening or other completion of any Dubbed Tracks.

D.     All internegatives, interpositives, optical soundtracks and/or "CRI's" (if any) included in the Initial Delivery Materials, and the Dubbing Materials (all of which are herein collectively called "Printing

Materials"), shall be returned to Lessor at Lessee's cost within forty five (45) days after receipt thereof by the applicable laboratory, except as otherwise may be provided in the Cover Letter.

    E.    Lessee hereby grants free and undisturbed access by Lessor at any time during normal business hours to the Dubbed Track, and to all other materials embodying or related to any Picture created by or under the authority of Lessee or otherwise in Lessee's possession or control such as, by way of illustration, trailers, teasers, subtitled versions and edited material ("Other Materials") both before and after expiration or termination of the Term under substantially similar terms as those set forth in the Letter. The Dubbed Track and Other Materials shall be held at Lessee's expense at such film and sound laboratory or other facilities as may be selected by Lessor and Lessee and shall not be moved or destroyed without Lessor's Consent.

    2.4.    As a material term of this Agreement, Lessee shall pay promptly when due:

    A.    To Lessor, all Manufacture Costs and Shipping Costs of all Prints.

    B.    To Lessor, all Manufacture Costs and Shipping Costs of any Additional Items and Printing Materials.

    C.    To the applicable film laboratory or other Person, all Manufacture Costs and Shipping Costs of (i) all Prints ordered pursuant to the terms of the Letter and (ii) all Dubbed Tracks and Other Materials, and Lessee agrees and does hereby hold Lessor harmless from and against any cost, loss, expense or damage resulting from Lessee's failure or refusal to pay when due any such Manufacture Costs or Shipping Costs. Should Lessor so elect at any time, Lessee shall pay any Manufacture or Shipping Costs in advance of Delivery on submission of an invoice therefor.

For avoidance of doubt, all of the costs referred to in subparagraph 2.4. hereinabove will be recoupable as provided in the Theatrical Lease Cover Letter.

    2.5.    As between Lessor and Lessee, Lessor shall own legal and equitable title to all Prints, Printing Materials, Dubbed Tracks and Other Materials and Additional Items by whomsoever supplied or paid for, at all times, and all rights therein, including copyright, shall vest in Lessor upon creation thereof subject only to possession by Lessee during the Term and for the exercise of the Rights, provided that Lessor shall be responsible for payments of any amounts due as a result of Lessor's use of such items. Lessee shall not sell, assign, pledge, mortgage or hypothecate any Prints, Printing Materials, Dubbed Tracks or Other Materials (except under the customary terms imposed by a film laboratory to secure payment of the costs of creating the applicable material) or Additional Items or make any disposition of the foregoing other than licenses in the ordinary course of business for the exercise of the Rights. All Prints, Printing Materials, Dubbed Tracks and Other Materials and Additional Items may be used by Lessee only during the Term in accordance with the terms of this Agreement. Lessee may not make or cause to be made any such materials except with Lessor's Consent or as specifically permitted in this Agreement nor shall Lessee permit any of such materials to be removed from the Territory or from the custody of such Persons designated or approved by Lessor. Lessee shall inspect, preserve and store, in places selected or approved by Lessor, all Prints, Printing Materials, Dubbed Tracks and Other Materials and Additional Items on prudent and customary terms, shall maintain appropriate insurance against their destruction or loss, shall maintain adequate inventory records with respect thereto which shall be adjusted and reviewed at least annually, and shall take reasonable measures to protect against any unauthorized or illegal Use thereof. On request, Lessee shall immediately advise Lessor in writing of the location and custody of any or all of such materials.

    2.6.    Within thirty (30) days after expiration or termination of the Term, Lessee shall deliver to Lessor at Lessor's then principal office, or such other location as Lessor shall designate in writing, all Prints, Printing Materials, Dubbed Tracks and Other Materials, Additional Items, Advertising Materials and the Letter delivered to or created by or under the authority of Lessee during the Term, excluding any Videos then held in inventory for which Lessee shall have "sell off" rights as provided herein. If Lessor shall so request in writing, Lessee shall destroy only such of the foregoing as may be designated in writing by Lessor and shall furnish to Lessor within ten (10) business days after receipt of Lessor's request a certificate of destruction sworn to before a notary public or United States consular office in the Territory. In the event of any loss, theft or destruction of any of the foregoing during the Term, Lessee shall furnish to Lessor such a certificate thereof within thirty (30) days after such event.

2.7.    Without limiting the generality of any other provision hereof, Lessee's prior or concurrent performance of all of its obligations hereunder, including without limitation payment of Advance Rentals, Manufacture and Shipping Costs and delivery of any Security for performance required under the terms of the Cover Letter, shall be strict conditions precedent to each and all of Lessor's obligations under this Article 2, including without limitation the obligation to make Delivery.

2.8.    Delays or limitations in the importation of the Picture in the Territory or any part thereof by reason of any quota or similar restrictions shall be solely the risk of Lessee.

3.    Use of Rights: Censorship

3.1.    The following shall be applicable to the Use of all Rights leased to Lessee in this Agreement:

A.    Lessee accepts the lease of all Rights and agrees to use all reasonable efforts consistent with sound business judgment to Use the Rights in the Picture under the terms hereof and to endeavor to obtain the maximum possible Gross Receipts and Net Receipts from the exercise of the Rights leased consistent with sound business judgment. Should Lessee sublease any of the Rights in whole or in part to any Person who shall act as a distributor or sub-distributor of any Rights then, unless there shall be a Lessor Consent, the Gross Receipts, Net Receipts and Distribution Expenses of such Person shall be deemed the Gross Receipts, Net Receipts or Distribution Expenses of Lessee for all purposes hereunder, and such Person shall be subject to and bound by all the terms and conditions of this Agreement as if that Person had executed this Agreement as Lessee and any breach or default by such Person shall be deemed a breach or default by Lessee hereunder. Notwithstanding the foregoing, should Lessee receive any advance or guarantee from any such Persons, such amounts shall be deemed Gross and Net Receipts hereunder for all purposes.

B.    Lessee agrees to not Use or authorize other to Use any Rights in the Picture in any Language in any nation or country in the Territory until the expiration of the Holdback Period set forth in the Cover Letter (if any) applicable to the Use of such Rights. Lessee may use Incidental Rights prior to expiration of a Holdback Period for the purpose of advertising its Use of Rights after expiration of the applicable Holdback Period.

C.    Lessee agrees to submit to Lessor the Artist Identification and advertising materials proposed by Lessee to be used in the exercise of any Rights hereunder including without limitation any trailers, teasers, key artwork, advertising accessories and lithographs, whether prepared by or under the authority of or otherwise delivered to Lessee ("Advertising Materials"), and Lessor shall have Right of Approval with respect to each of the foregoing Advertising Materials. Said Right of Approval over the Advertising Materials must be obtained by Lessee in writing from Lessor. Lessor and Lessee shall fully consult with each other in good faith concerning (i) the items and amount of expenditures for advertising and publicizing the Picture and (ii) the number of Prints of the Picture to be manufactured for the account of Lessee. Lessee shall not sell, license or otherwise turn to account for a consideration, separate from the licensing of Rights, any Advertising Materials without Lessor's Right of Approval. Lessee shall make Use in the exercise of the Rights only of such English Language title or titles for the Picture as Lessor shall designate. Lessor shall have the right from time to time by Notice to Lessee to change the title or titles of the Picture as it shall elect in its sole discretion, and from and after any applicable Notice of change of title, Lessee shall use in the exercise of the Rights only the applicable changed title or titles designated by Lessor.

D.    Lessee shall not make or permit to be made, in any advertising, publicity or otherwise, any statement, directly or indirectly, expressly or by implication, which:

(i)    Associates or relates (whether or not as any endorsement) any Artist Identification to any article, product or service other than the Picture.

(ii)    Associates or relates the Picture, any Advertising Materials or title, characters, story or other aspects of the Picture to the sale or exploitation of any product, article or service other than the Picture.

(iii)    Indicates that any of the Persons rendering services in connection with the Picture are connected or associated with, or employed or engaged by, Lessee.

E.    All Prints and Videos embodying the Picture shall be used hereunder only in their original continuity without any deletion, cut, alteration, change, addition or interpolation of any motion picture, commercial or other material of any nature or kind whatsoever, except with Lessor's Consent or in Use of Television Rights to add commercial material or to meet broadcast time requirements; and provided that Lessee shall have the right but not the obligation to include prior to the main titles, or after the end titles, of the Picture and in Advertising Materials the words "Distributed by" Lessee.

F.  .  Lessee shall comply in all respects with the billing and credits ("Credits") embodied in the Prints, Printing Materials and in the Additional Items as delivered to Lessee hereunder and, without limiting the foregoing, Lessee shall strictly adhere to the requirements of the Credit Schedule (which Lessor shall deliver to Lessee) in all Advertising Materials and no Credits shall be changed or eliminated in any manner whatsoever; provided, however that if Lessor does not deliver a Credit Schedule, then Lessee must demand same from Lessor in writing before preparing any Advertising Materials. So long as Lessee complies with the terms hereof relating to Credits, Lessor shall indemnify and hold Lessee harmless from and against any loss, expense or damage arising out of Lessee's compliance with the terms hereof relating to Credits.

G.    Should the duly enacted laws of any nation or country in the Territory require the submission of motion pictures generally to a board of censors or similar duly constituted agency acting with the authority of the applicable government ("Censor"), Lessee shall submit the Picture to the applicable Censor for approval and shall use its best efforts to obtain approval without any alteration of the Picture as soon as reasonably practicable, but in no event later than thirty (30) days after the Delivery Date on the following terms: Lessee shall pay all censorship charges and fees incurred in submission of the Picture to the Censor and all costs and expenses of contesting any decision of the Censor, all of which shall be Distribution Expenses hereunder. All risk of banning shall be borne solely by Lessee; likewise, if the Picture is approved by the Censor, the risk of subsequent withdrawal or revocation of such approval shall also be solely borne by Lessee. If editing changes are required in the Picture by reason of any censorship objections, Lessee shall advise Lessor promptly in writing, including the specific changes required. Lessor shall promptly thereafter advise Lessee of any contractual limitations on the making of such changes. Subject to the foregoing, Lessee may make such changes at Lessee's expense, but may do so only in accordance with such limitations and only to the extent required to meet censorship objections. However, notwithstanding the preceding sentence, Lessor shall have the right to designate a representative who may make such changes or (at Lessor's option) may supervise Lessee in the making of such changes; and Lessor shall, in any event, have a Right of Approval of all changes made by Lessee. As set forth in Paragraph 2.8, any delays or limitations caused by any Censor shall not in any manner limit, delay, impair or affect Lessee's obligations to make payment of any Advance Rentals, except as expressly set forth in the Cover Letter. There shall be no cancellation or reduction of Advance Rentals by reason of television or video censorship or indexing of the Picture.

H.    All agreements between or among Lessee and its Affiliates with respect to the Picture (including without limitation rental terms and advertising and publicity thereof and all other Distribution Expenses) shall be on terms customary in the Territory and no less favorable to Lessor than comparable agreements between Lessee or its Affiliates and unrelated Persons. Any agreement or other arrangement under which any Rights are granted to any Person in connection with or as part of a plan or arrangement for the grant of any rights to use any other Motion Picture (including without limitation shorts, trailers and teasers) or any other product or service owned, controlled or under license to Lessee or an Affiliate or manufactured, sold or distributed by Lessee or an Affiliate shall be made on an arms length and non-discriminatory basis.

I.    Lessee shall take all necessary or appropriate steps in the name of Lessor (or such other name as Lessor may designate) and shall pay any and all fees and costs necessary to secure protection for the Picture, the Printing Materials, Prints, Advertising Materials and all other materials relating thereto used by Lessee in the exercise of the Rights, under the copyright, trademark or other similar laws under which motion pictures, other intellectual property, trademarks, ideas, characters, titles and names are accorded legal protection in the Territory ("Copyright and Similar Laws") and to renew, extend and maintain protection for the Picture and all materials relating thereto under Copyright and Similar Laws of the Territory throughout the Term on the following terms:

(i)    Lessee shall also register the Picture and such other material if customary in the Territory with anti-piracy organizations in the Territory, and shall take such other reasonable and customary protective

steps as Lessor may designate. Lessee shall promptly notify Lessor in writing of any information coming to Lessee's attention as to any possible infringement ("Infringement") in the Territory of any rights in and to the Picture and all materials related thereto protected under the Copyright and Similar Laws of the Territory, whether by any unauthorized or illegal Use of any Rights or by a failure to comply with the terms of any agreement under which any Rights have been granted (including failure to make payments or otherwise).

(ii)  Lessee shall promptly take all reasonable legal steps necessary to enforce and protect the interests of both parties and to obtain redress and restrain anyone from unauthorized exhibition of the Picture or duplication of any Print or the manufacture, distribution or advertising or exploitation of unauthorized Video Devices, or the doing of anything which infringes upon the Picture, the Prints, any Printing Materials or any Advertising Materials of the copyrights or trademarks therein.

(iii)  The costs thereof shall be advanced by Lessee, and shall be treated as a Distribution Expense. Lessor shall be free to participate in such action using counsel of its choice, at Lessor's expense, provided that Lessor's expenses thereof shall be repaid to Lessor out of any recovery in such action, pari passu with Lessee's expenses therein. If Lessee shall fail or refuse to take any of the foregoing actions, then, in addition to any other rights Lessor shall have hereunder or at law, Lessor may (but shall not be obligated to) do so, in Lessor's and/or Lessee's name. Any recovery from such action undertaken by Lessor shall be paid to Lessor. Any net loss from such action shall be treated as a Distribution Expense of the Picture.

(iv)  Lessee agrees that Lessor shall not be responsible for any unauthorized importation, reproduction, transmission, exhibition, manufacture or distribution (including, but not limited to, by way of Prints, Videos, television or theatrical reproduction, transmission or exhibition) of the Picture or any trailers thereof which may appear in the Territory, nor for any reception in the Territory of any type of broadcast, reproduction or exhibition originating from outside the Territory not authorized by Lessor.

(v)  Lessee shall notify Lessor in writing of the occurrence of any event relating to the provisions of this Paragraph and all actions taken with regard thereto. Lessee shall not be obligated to commence litigation hereunder unless in good faith it determines such as necessary or appropriate.

I.    The lease of all Rights and Incidental Rights shall terminate and revert to Lessor, free and clear of any claim, lien, encumbrance or charge in favor of Lessee or any Person deriving rights through or by means of Lessee, upon expiration or termination of the Term, immediately and without any action or notice by any Person. Lessee shall not at any time enter into any agreement with any Person for the exercise of any Rights or Incidental Rights (i) outside the Territory or (ii) after expiration or termination of the Term. Lessor may at any time enter into any agreement for the exercise of any Rights or Incidental Rights (i) outside the Territory or (ii) after expiration or termination of the Term.

K.    Lessee shall not at any time purport to make any sale, license, sub-distribution, assignment, transfer, delegation or grant ("Delegation") to any Person (whether or not an Affiliate) of any or all of the Rights without Lessor's Consent, and any attempted Delegation without Lessor's Consent shall be null, void and without effect ab initio. Any provision of this Agreement pertaining to any receipt or expense of, or any act by, any Person to which Lessee has (by the terms or implication of such provision) made any Delegation, shall not be construed to permit any Delegation without first obtaining Lessor's Consent. Any Delegation made or part of transfer or sale of all or substantially all of Lessee's assets shall not require a Lessor Consent.

3.2.    The following shall be applicable to the exercise of Theatrical Rights and Non-Theatrical Rights if granted to Lessee hereunder:

A.    Lessee shall commence a commercial release and distribution of the Picture by exhibition in theaters of 35mm or larger gauge Prints before paying audiences in all major cities in the Territory ("Initial Theatrical Release"), on date(s), in a pattern and on a schedule submitted in writing to Lessor and after good faith consultation with Lessor. Lessee shall further maintain the Picture in continuous distribution throughout the Territory, for a period consistent with Lessee's reasonable business judgment and shall endeavor to obtain the largest possible Gross Receipts and Net Receipts from the distribution and exploitation of the Theatrical Rights

leased herein. Lessee shall not subdistribute the Picture in any "key city" or material part of the Territory without Lessor's Consent.

B.     No personal engagement for exhibition of the Picture (a "Booking") shall be made on a flat fee basis or by means of a "four-wall" engagement or as a part of a "double-feature" or other multiple feature except with Lessor's Consent. If the Picture is exhibited in any theatre together with any so-called "short subject", no portion of the total exhibition receipts shall be allocated to such "short subject", except with Lessor's Consent. Lessor acknowledges that up to 6% of Percentage Rentals can be so allocated without Lessor's Consent if applied consistently to all motion pictures distributed by Lessee and is customary in the Territory.

C.     Lessee shall give Lessor at least thirty (30) days' advance notice (if possible) of all premieres of the Picture in the Territory. Lessee shall not enter the Picture in any festivals or the like without Lessor's Consent.

D.     Lessee shall promptly bill each exhibitor in full consistent with Lessor's customary practices, and shall obtain statements of box office receipts from each exhibitor, in the case of percentage engagements, all of which shall be included in Lessee's "Books" under Paragraph 4.5 of the Standard Rental Terms. Lessee shall audit and check the box office receipts derived from any exhibition of the Picture under percentage engagements subject to Lessee's customary practices. All results of such audit and checking shall be included in Lessee's "Books" under Paragraph 4.5 of the Standard Rental Terms.

3.3.     The following shall be applicable to the exercise of Video Rights if granted to Lessee hereunder:

A.     Lessee shall Use Video Rights in the Territory only in the configurations (Videocassettes or Video Discs) and formats (NTSC, PAL or SECAM) indicated in the Cover Letter. Lessee shall not directly or indirectly manufacture Videos embodying the Picture which are intended or reasonably may be expected to be shipped or delivered outside the Territory or after the Sell Off Period defined below or in configuration or formats not leased to Lessee hereunder.

B.     All Videos will be manufactured to a style and quality comparable to the best standards of video style and quality in the Territory.

C.     After first release of Videos of the Picture for commercial distribution and throughout the Term, Lessee will make available Videos of the Picture for sale in the ordinary course of business through its catalogue and other normal channels of trade.

D.     Lessee shall not distribute more than 20 %  (or as customarily shipped by Lessee for major motion pictures in the Territory) of all Videos shipped in any Accounting Period as "free goods" or to be given away as promotional items (excluding screening cassettes not packaged for resale) ("Free Goods"). No Royalty Rate shall apply to Free Goods (not in excess of this limit) so long as such are not directly or indirectly transferred or distributed for any consideration other than promotional value. The Royalty Rate shall apply to any Free Goods in excess of the limits set forth above.

E.     The "Wholesale Price" shall be the regular suggested wholesale price of Videos shipped by distributors to rack jobbers, sales agents, retail outlets and similar Persons (collectively referred to as "Wholesale Dealers"). Shipments to other sub-distributors shall not, for purposes hereof, be shipments to Wholesale Dealers. The Wholesale Prices of Videos embodying the Picture shall be commensurate with the Wholesale Prices of Videos embodying other Motion Pictures of comparable commercial quality and success. Lessee shall establish the Wholesale Price of Videos embodying the Picture on a fair and non-discriminatory basis.

F.     Lessee may establish reasonable reserves for returns not to exceed (without Lessor's Consent) 5% of Videos shipped in any accounting period and all such reserves shall be liquidated and unreturned Videos added back to shipments for calculation of sums due to Lessor within three (3) Accounting Periods after the Accounting Period in which such reserve is established.

G.     Lessee shall at no time manufacture Videos in excess of its reasonable anticipated requirement to meet normal customer demand, in anticipation of expiration of the Term or otherwise. Upon expiration of the Term,

Lessee shall have the non-exclusive right for a period of six (6) months after expiration of Term (the "Sell-Off Period") to sell its remaining inventory of Videos embodying the Picture through normal channels of trade at no less than the Wholesale Price for which such Videos were offered for sale during the Term and not in anticipation of later "sell-off".

3.4.    The following shall be applicable to the exercise of Television Rights if granted to Lessee hereunder:

A.    Lessee shall make best efforts to give Notice to Lessor of each license or agreement it intends to enter into for the Use of any Television Rights granted to Lessee hereunder, together with the material terms thereof. Lessor shall have a Right of Approval of any such license or agreement if at that time the Advance Rentals have been recouped from Rentals and if Lessor is entitled to a percentage of Lessee's Gross or Net Receipts from Use of Television Rights

B.    Lessee shall notify Lessor of each telecast or other exercise of Television Rights in the Territory within ten (10) business days after the applicable telecast or exercise shall occur.

C.    The "overspill" and other conditions and definitions of Television Rights (e.g. Paragraph 1.42A above) shall apply throughout the Term.

D.    "Gross Receipts" for purposes of any license of Television Rights shall be the amounts paid by the broadcaster or cablecaster and any third party fees or commissions in connection with Gross Receipts from Television Rights shall be subject to Lessor's Right of Approval.

3.5.    Except as may be specifically set forth in the Cover Letter, Lessor specifically reserves all right, title and interest in and to revenues generated from the Picture as a result of the retransmission of, or recording from, any television broadcast of the Picture or as allocated to the Picture for royalties or other sums collected on sales of blank tapes, video recorders or other devices, to compensate for unauthorized private reproduction of motion pictures ("Video Compensation"). Any and all monies which may be payable or paid with respect to the exploitation of the Picture by virtue of such cable or over-the-air retransmissions of any broadcast of, or recording from, the Picture within or outside the Territory received in or retransmitted in or from outside the Territory as well as any Video Compensation shall be the sole property of Lessor ("Special Funds"). In that connection, Lessor shall have the sole and exclusive right to apply for and collect Special Funds derived from the Picture from any source, including, but not limited to, agencies, societies or organizations (such as AGICOA, VGF and similar organizations) established for the purpose of collecting and disbursing Special Funds. Lessee shall not claim any Special Funds, but in the event Special Funds are paid to Lessee by the applicable agency, society or organization, then Lessee shall immediately remit one hundred percent (100%) of Special Funds to Lessor with the appropriate statement setting forth the nature of such payment.

4.    Accountings, Reports and Payments

4.1.    If the Rentals are due to Lessor hereunder based on the Gross or Net Receipts of Lessee, Lessee agrees to deliver to Lessor a written statement ("Statement") in the form set forth in Paragraph 4.2 below of the Rentals due with respect to the Picture for ("Accounting Periods"):

Each calendar quarter (e.g., the three (3) month periods ending March 31, June 30, September 30 and December 31) ending after the Release Date and beginning on a date during the Term.

Each Statement will be delivered to Lessor within sixty (60) days after the end of the applicable Accounting Period and shall be accompanied by notice of payment of the amount shown due thereon, as provided below, in the applicable currency of the Rentals shown due on the applicable Statement. Lessee may recoup and deduct any Advance Rentals from Rentals to the extent not previously recouped unless otherwise indicated in the Cover Letter provided that in no event shall Rentals be cross-collateralized against any advances given with respect to any other Motion Picture or any other claim or debt arising between the parties or their Affiliates. All Statements shall be based, and Gross Receipts and Net Receipts shall be calculated, pursuant to Lessee's customary and consistently applied methods of accounting. All allocations of Gross Receipts and Distribution Expenses between or among the Picture and other Motion Pictures (including de facto allocations resulting from settlements with exhibitors made at or almost the same time) shall be made in good faith, shall be reasonable and shall

REVEREsalesagencyagmnt                27
5-22-02

properly reflect the comparative success of the applicable Motion Picture (in the case of Gross Receipts) or the relative prominence, space or use (in the case of Distribution Expenses). In addition to Statements, Lessee shall provide telex or fax information as follows regarding the gross box office receipts derived from Use of Theatrical Rights in the Picture:

    (a)    Daily for the first two weeks of the Initial Theatrical Release (and of each re-release) for the major cities in the Territory, to be forwarded on the next business day; and

    (b) ·   Weekly for the balance of the Initial Theatrical Release and any subsequent Use of Theatrical Rights for the entire Territory, to be furnished on Monday morning for the preceding week.

    4.2.    Each Statement shall include a detailed cumulative report of Gross Receipts, Distribution Expenses (whether or not recoupable by Lessee under this Agreement), Distribution Fees and Rentals in Lessee's customary form, including the following:

    A.    A report of the aggregate gross box office receipts and deductions therefrom, billing and collections for all Uses of Rights in the applicable Accounting Period.

    B.    A concise textual description of the Distribution Expenses (whether or not recoupable by Lessee under this Agreement) paid or incurred in the applicable Accounting Period.

    C.    Copies of any general reports of box office receipts of the Picture and other motion pictures generally available in trade publications or published by distributor, exhibitor or governmental organization in the Territory.

    D.    All applicable currency exchange rates used by Lessee in determining recoupments and remittances as provided for in Paragraph 4.3B below, including the dates of such exchange rates.

    4.3.    A.    Subject to Paragraph 4.4., all payments of Advance Rentals, Rentals or other sums due to Lessor hereunder (whether directly or by payment under any letter of credit) shall be made by bank wire transfer to the bank and bank account set forth in the Cover Letter or as otherwise designated by Notice from Lessor, except for Advance Rental payments agreed to be paid by letter of credit or unless Lessor shall otherwise give Lessor's Consent. Each time a payment is made, Lessee shall also immediately advise Lessor thereof by telex or fax, indicating the amount of such payment and the remitting bank. No payment shall be deemed made until credited to Lessor's bank account by Lessor's bank under its customary conditions by receipt of cash or unconditional clearance of any bank transfer or other method of payment as to which Lessor's Consent shall be given. Any payments by Lessee not paid when due shall bear interest at the rate of six percent (6%) per annum compounded quarterly until paid in full.

    B.    All Advance Rentals and Rentals shall be paid in U.S. Dollars and, if converted from another currency, shall be converted at the official exchange rate prevailing on the date payment is due under the terms hereof, or when made, whichever is more favorable to Lessor or, in lieu of the foregoing, at a date (if any) agreed in writing between Lessor and Lessee. All costs of currency conversion, banking charges, permit fees and transmittal costs shall be paid by Lessee and shall not reduce Rentals hereunder. All Advance Rentals will be converted into local currency (if other than U.S. Dollars) when due or made (whichever is more favorable to Lessor) and Lessee's accounts for purposes of any permitted recoupment shall be maintained in local currency. Notwithstanding the foregoing, Lessor shall be responsible for all charges or fees by its banks.

    4.4.    If Lessee shall be prohibited or restricted from making payment of any monies at the time when due and payable to Lessor hereunder by reason of the laws or currency regulations within the Territory ("Blocked Funds"), Lessee agrees to give prompt Notice to Lessor thereof. Subject in all cases to Lessor's rights under this Agreement Lessee agrees, upon Lessor's request, either (i) to deposit any Blocked Funds to the credit of Lessor in a bank or banks designated by Lessor in the Territory or (ii) to pay any Blocked Funds promptly to such Persons in the Territory, as Lessor may designate in writing. Lessee agrees to use all reasonable efforts to avoid or satisfy any restrictions on remittances to Lessor.

    4.5.    A.    Lessee agrees to maintain full and complete records of all transactions made by Lessee in connection with the Picture including books of account, records, papers, correspondence, vouchers, contracts, other data, copies of all box office receipts, booking books and records, film cards and Print inventories (collectively, the "Books").

REVEREsalesagencyagrmnt
5-22-02

28

Lessee shall keep and maintain the Books continuously throughout the Term and for one year thereafter, and thereafter so long as any dispute may be outstanding with respect to any item or thing. In the event the calculation of Rentals is made by Lessee on a computer-based system, Lessee's "Books" shall include all machine-readable date utilized in such system and the related documents describing the applicable system.

      B.     During the Term and for one (1) year thereafter, and so long thereafter (i) as any of the provisions hereof shall continue in effect and (ii), in case of any dispute of which Lessor notifies Lessee in writing, until such dispute has been finally determined in a settlement or a judgment not subject to further appeal, Lessor shall have the right through its accountants at all times during regular business hours to have free and full access to and to examine all Books upon two (2) weeks advance Notice. Lessor shall have the right to require of Lessee's officers such information and reasonable examination, if so requested, of any and all items and transactions as Lessor may require for a proper understanding of any portion of the Books as related solely to the Picture. Lessor or its accountants shall have the full and absolute right to make copies of and take excerpts from any and all Books and, upon Lessor's request, Lessee shall furnish copies of all box office receipts relating to the Picture.

      C.     Lessor may not audit more than one (1) occasion for each twelve (12) month period and shall audit only with reasonable advance Notice and shall not continue any audit for an unreasonable period of time. No Statement shall be contestable more than twenty-four (24) months after first rendered unless the parties shall otherwise agree. All inspections shall be at Lessor's expense unless it is determined that the Rentals for the Accounting Periods to which inspection relates were actually five percent (5%) or more greater than the Rentals shown on the Statements initially rendered to Lessor for the applicable Accounting Period, in which event Lessee shall pay to Lessor an amount equal to all costs incurred by Lessor in connection with the applicable inspection.

    4.6.    A.     Lessee shall obtain all necessary permits from all applicable authorities to make all payments to Lessor required under this Agreement. Lessee shall pay without limitation any territorial tax, levy or charge howsoever denominated, imposed or levied against Lessor by any statute, law, rule or regulation now in effect or hereafter enacted including, without limitation, quotas, licenses, contingents, turnover taxes, import permits, national, state, county, city or other taxes howsoever denominated, relating to or imposed upon film rentals, negatives, prints or other material, or the right or privilege to use the same in connection with the Picture and whether imposed or levied on or in connection with the importation of any material supplied by Lessor hereunder or otherwise ("Taxes") and, except as provided in Paragraph 4.6B below, all payments to Lessor shall be free and clear of any Taxes. Lessee may treat Taxes as Distribution Expenses but only to the extent provided for in Paragraph 1.11 of these Standard Rental Terms; and should any such Taxes be subject to refund or reduction in whole or in part at any time, then the applicable amounts shall be deemed to reduce such Distribution Expenses at the time Lessee or other applicable party becomes entitled to the applicable refund or reduction. Except as herein specifically provided, Taxes will not be deductible by Lessee in determining Rentals; but all Taxes shall be deemed paid by Lessee on behalf of and for the account of Lessor, and Lessor shall be entitled to all tax benefits therefrom.

      B.     Notwithstanding Paragraph 4.6A, any so-called "remittance taxes" and similar Taxes required to be withheld or paid upon any payments to Lessor hereunder may be deducted from payments to Lessor hereunder, provided that a certificate of deduction and withholding shall accompany the Statement or other payment rendered to Lessor and provided that upon payment of such tax, there is sent to Lessor a photostatic copy of the governmental receipt establishing a payment thereof, and provided further, that Lessee's right to deduct such Taxes is subject to Lessee first notifying Lessor in writing that the deduction of such Tax is required under applicable law and affording to Lessor opportunity for thirty (30) days to take steps to avoid the necessity of such withholding, all of which shall be done before Lessee actually pays any such Taxes to the applicable governmental agency.

### 5.    Warranties/Indemnities/Force Majeure/Termination

    5.1.     Lessor warrants, represents and agrees that, except as specifically provided herein or as may be disclosed in writing to Lessee on or before execution hereof, (i) it has the legal right to enter into this Agreement and to lease all Rights and Incidental Rights in the Picture for the Territory during the Term free and clear of any claims, liens, charges or encumbrances which would impair or adversely affect Lessee's Use of any Right or Incidental Right for the Territory and during the Term, (ii) it has not granted and will not grant to any other Person any Rights in the Territory for exercise during the Term, (iii) Lessor will have the quiet enjoyment of the Rights during the Term, (iv) Lessor will provide that all Persons

providing services on the Picture have been and/or will be timely paid all amounts due to them and (v) Lessor shall not, and shall not authorize or permit any other Person to Use the Television Rights in the Picture outside the Territory where such use is capable of being received in or transmitted to the Territory except (a) in encrypted form where the broadcast is not primarily intended for reception in the Territory, or (b) is not received in a material portion of the Territory or (c) is not in the Languages. Lessor agrees to indemnify and hold Lessee harmless from any loss, cost, expense or damage arising out of breach or alleged breach by Lessor of the terms hereof, including all warranties set forth above. Should any claim or demand be made against Lessee as to which Lessee may be entitled to indemnity hereunder ("Claim"), Lessee shall give prompt Notice thereof to Lessor and Lessor shall have the sole and exclusive right to defend, settle or compromise any Claim through counsel of its choice on such terms and in such manner as Lessor shall in its sole discretion determine. Lessor shall have the right to terminate the Term (exercisable by Notice to Lessee effective immediately) should any Claim be made that Use of the Rights in the Territory infringes or would infringe any copyright or other similar rights, except that such termination shall not limit or impair Lessee's rights to damages hereunder subject to the limitations provided for in Paragraph 5.5 below. In the case of such a termination, Lessor shall fully refund all portions of the Advance Rentals actually received from Lessee to the extent that they have not yet been recouped by Lessee from the exercise of the rights, as well as all unrecouped distribution expenses already incurred. Lessor does not make and hereby expressly disclaims any warranty, representation, agreement or indemnity not expressly set forth herein.

5.2.    Lessee agrees to indemnify and hold Lessor harmless from and against any claim, action, liability, loss, cost, expense (including attorneys' fees and costs) or damage arising out of or based upon Lessee's breach or alleged breach of any term or condition hereof or any action, omission, statement or other conduct by Lessee in the conduct of its business or the exercise of the Rights or Incidental Rights not covered by Lessor's indemnity in Paragraph 5.1 above. Should any claim or demand be made against Lessor as to which Lessor may be entitled to indemnity hereunder ("Claim") Lessor shall give prompt Notice thereof to Lessee and Lessee shall have the sole and exclusive right to defend, settle or compromise any Claim through counsel of its choice on such terms and in such manner as Lessee shall in its sole discretion determine; provided however, that Lessor shall have the right to have additional counsel, of Lessor's choice and at Lessor's cost, participate in such defense.

5.3.    Should the production or Delivery of the Picture be hampered, interrupted or interfered with by reason of the unavailability for any reason of the star(s) and/or director, the death or incapacity of any actor or the director or their inability to qualify for cast insurance, fire, flood, casualty, lockout, strike, labor condition, unavoidable accident, national calamity, mechanical or other breakdown of electrical or sound equipment, failure or delay on the part of any laboratory or supplier, delay in or lack of transportation, export embargo, riot, war, civil commotion, act of God, the act of any legally constituted authority or by any other cause or causes (whether similar or dissimilar to the foregoing) beyond the reasonable control of Lessor (all of which events are herein called "Force Majeure"), then Lessor's obligations in respect of the Picture shall be suspended during the period of occurrence of such event and Lessee shall not be entitled to claim damages from Lessor or to cancel this Agreement, except that if a Force Majeure continues in excess of three (3) months, either party shall have the right thereafter to cancel this Agreement by written notice (unless Lessor gives notice to Lessee that such Force Majeure will end within thirty (30) days after such notice of cancellation), in which event Lessor shall return any Advance Rentals theretofore paid by Lessee to Lessor and Lessor shall not be entitled to claim any damages from Lessor. Lessor shall not be liable for any failure, misfeasance, malfeasance or non-feasance of any carrier, transportation agency, laboratory or any other persons, firms or corporations or for any causes not within the reasonable control of Lessor, or for any action, omission or delay not directly due to the negligence or default of Lessor or its authorized employees. In any of such events (all of which are also "Force Majeure"), Lessor shall be discharged from any liability whatsoever and any and all claims arising therefrom are hereby expressly waived by Lessee. Lessee may suspend its obligation hereunder (other than the obligation to pay Advance Rentals) for up to six (6) months for any Force Majeure materially affecting a majority of distributors in the Territory or may terminate the Term (but not its obligation of pay the Advance Rentals) if such Force Majeure continues for more than six (6) months.

5.4.    No breach by either party of any term or condition herein shall be deemed material until the other party has given Notice to the defaulting party and the defaulting party shall fail or refuse to substantially cure or correct the applicable breach or default within thirty (30) days after the applicable Notice or within ten (10) business days if the breach is either failure to pay monies when due or to deliver any Security required in the Cover Letter.

5.5.    Except as provided in the Cover Letter and as otherwise provided herein, Lessee shall have no right (i) to revoke, cancel or rescind this Agreement by reason of any breach hereof by Lessor (whether or not material) (provided that Lessee shall retain all its rights to terminate the Term hereunder) or (ii) to claim or demand from Lessor any "lost profits",

consequential damages or other similar measure of damage not calculated by reference to actual direct out-of-pocket costs or expenses. Lessor shall be entitled to seek injunctive or other equitable relief (an "Injunction") to restrain, prevent or enjoin any use by Lessee of Rights not granted hereunder. Upon termination of the Term by reason of Lessee's uncured material breach, Lessor shall be entitled to retain all sums paid to it hereunder and Lessee shall and does hereby assign to Lessor all its rights in and to all licenses and other agreements entered into by Lessee during the Term with respect to the Picture and Lessor may collect and retain for its own account all monies or other consideration then or thereafter due under the terms of the applicable license or other agreement.

6.       General Provisions

6.1. All Statements and other documents or material to be delivered to Lessor or Lessee shall be delivered to the applicable party at the applicable address set forth below. All notices to be given by either party under the terms hereof (a "Notice") shall be in writing and shall be deemed given (i) by addressing the applicable Notice as indicated below and by depositing that Notice air mail, air courier, postage prepaid, in the appropriate government mail system; (ii) by telefax; or (iii) by delivering the applicable Notice, toll prepaid, to a telegraph or cable company. All Notices shall be deemed given only on receipt. The addresses of the parties, until Notice to the contrary, are as set forth in the Cover Letter. All Statements, Notices and deliveries to Lessor shall be deemed given if made or given in accordance with the terms hereof to Lessor at the following address:

SEVEN ARTS INTERNATIONAL
12 Chiswick Lane
London  W4 2JE
UNITED KINGDOM
Fax No.: 011 44 207 742 7666

with a courtesy copy to:

CINEVISIONS
9051 Oriole Way
Los Angeles, California  90069
UNITED STATES
Attn:  Mr. Peter Hoffman
310/887-3830 (phone)
310/887-3849 (fax)

6.2.       This Agreement supersedes any and all oral and written agreements, promises, statements, representations and information given by either party and contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and the transactions contemplated hereby; all prior discussions, agreements and understandings of any nature between the parties are merged herein and superseded hereby. This Agreement may not be modified orally; no waiver, amendment or modification shall be binding or effective unless in writing and signed by the party sought to be charged. Lessor and Lessee shall execute any and all documents and instruments and shall do all acts which may be necessary or appropriate to fully implement the provisions of this Agreement. Should Lessee fail to execute any such document or instrument within five (5) business days after a written request from Lessor to do so, Lessee hereby grants to Lessor a power of attorney, irrevocable and coupled with an interest, to execute and acknowledge any such document and instrument in Lessee's name but for Lessor's benefit.

6.3.       This Agreement is subject to all applicable laws and treaties. This Agreement, its validity, construction and effect shall be governed by and construed under the laws of England applicable to contracts executed therein and wholly to be performed therein. Paragraph headings used herein are for convenience only, are not part of this Agreement and shall not be used in construing it. Words used in the singular shall include the plural and vice-versa. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. If any part of this Agreement is declared invalid or unenforceable by any governmental authority or court of competent jurisdiction, the validity of the balance of this Agreement shall not be affected, provided, however, that if any provision of this Agreement pertaining to the payment of monies to Lessor is declared invalid or unenforceable, Lessor shall have the right, at its option, to terminate the Term upon giving not less than ten (10) days written notice to Lessee.

Subject to any applicable government rules or regulations, or the laws of any applicable jurisdiction, time is of the essence with respect to all payments hereunder.

6.4. In the event of any action, suit or proceeding hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees, in addition to the costs of said action, suit or proceeding. Lessor and Lessee, each as to and for the benefit of the other: (a) hereby irrevocably submit to the exclusive jurisdiction of the commercial courts in London, England (the "Applicable Court") for the purpose of any action, suit or proceeding arising out of or based upon the subject matter of, or transactions contemplated by, this Agreement (each an "Applicable Action"); (b) hereby irrevocably waive and agree not to assert (by way of motion, as a defense or otherwise) in any Applicable Action brought in the Applicable Court any claim (i) that it is not subject personally to the jurisdiction of the Applicable Court; (ii) that the Applicable Action is brought in an inconvenient forum; (iii) that the venue of the Applicable Action is improper; or (iv) that this Agreement or its subject matter may not for any other reason be enforced in the Applicable Court; (c) hereby irrevocably consent to service of process of the Applicable Court in the same manner as any other Notice is served on Lessor or Lessee (as the case may be) pursuant to Paragraph 6.1 above; and (d) irrevocably agree that final judgment (including the exhaustion of all rights to appellate review) in any Applicable Action ("Judgment") shall be conclusive and may be enforced in any other jurisdiction (i) by action, suit or proceeding on the Judgment, a certified and true copy of which shall be absolutely conclusive evidence of the fact and of the amount of any liability under or pursuant to the Judgment; or (ii) in any other manner not prevented by any applicable law.

6.5. All of Lessor's and Lessee's rights and remedies under this Agreement shall be cumulative. The exercise by either party of rights under any one provision hereof or their rights at law shall not be deemed an election of remedies. Without limiting the generality of the foregoing, Lessor's claim for interest under Paragraph 4.3 or its election to terminate the Term for failure by Lessee to make a payment when due shall not limit, impair or affect Lessor's rights, respectively, to terminate the Term for such failure to pay money when due, and to claim any damages to which it may be entitled. The waiver by either party of any breach of this Agreement shall not be deemed a waiver of any preceding or succeeding breach of the same or any other provision hereof. Neither party shall be deemed to have waived any provision hereof except in writing signed by the party to be charged.

6.6. Nothing in this Agreement shall be deemed to create a partnership, joint venture, or any relationship other than as lessor/lessee and in no event shall either party be liable for the actions, statements or omissions of the other. There shall be no third party beneficiaries of this Agreement and this Agreement shall not be deemed to create or evidence any right or remedy of any third party, whether or not designated herein.

6.7. Lessor shall have the right to assign its right to payment under this Agreement or all or any portion of Lessor's rights hereunder with Notice to Lessee, and may freely make any Delegation of its obligations hereunder. If Lessor assigns any of its rights hereunder (to payment or otherwise) to any third party, Lessee shall upon the request of Lessor and/or its assignee execute one or more undertakings (in such form as Lessor and/or its assignee may reasonably require) whereby Lessee agrees to make payment and/or otherwise render performance directly to such assignee.

EXHIBIT "C"

**City National Bank**

ESCROW AGREEMENT

This Escrow Agreement (the "Escrow Agreement") is entered into as of [____] by and between City National Bank, a national banking association (the "Escrow Agent"), CineVisions, a California ("Agent") and [_] ("Company").

1.    **DEFINITIONS:** Terms shall be defined as set forth on Schedule A, attached hereto.

2.    **ESCROW FUND:**

2.1    **Establishment of Escrow.** The purpose of this Escrow Agreement is to establish a collections account (the "Escrow Fund"), to be administered by the Escrow Agent, for the purpose of receiving and distributing Gross Receipts derived from distribution of the Picture in accordance with the terms of this Escrow Agreement and the Sales Agency Agreement.

2.2    **Deposit of Funds.** Agent shall instruct buyers of the Picture to pay all Gross Receipts to the Escrow Fund at the following address:

> City National Bank
> 1950 Avenue of the Stars, 2nd Floor
> Los Angeles, California 90067
> Attn: CNI Escrow Services

Each payment of Gross Receipts shall reference the Account Name and Account Number.

In the event Gross Receipts are paid directly to Agent or Company, such Gross Receipts shall be immediately transferred to the Escrow Fund without deduction of any charges or expenses. The Escrow Agent shall have no duty with respect to the collection of funds paid directly to either Agent or Company and the Escrow Agent will not, and has no duty to, make a determination as to whether any deductions were made by either Agent or Company prior to transfer to the Escrow Fund.

2.3    **Payment of Funds.** All Gross Receipts shall be paid in United States Dollars to the extent possible. If a payment is made in funds other than United States Dollars, Escrow Agent shall convert such foreign currency to United States Dollars at the then prevailing rate for similar foreign currency transactions available to Escrow Agent at the same time, subject to Escrow Agent's then published fees and charges.

2.4    **Distribution of Funds.** All Gross Receipts held as collected funds shall be distributed from the Escrow Fund on the fifth business day following each month end first to pay any due and

REVEREsalesagencyagmnt                           33
5-22-02

unpaid fees and cost of the Escrow Agent, and then, provided that the balance held in the Escrow Fund is at least $2,000.00, remaining funds shall be distributed as set forth on Schedule B.

3.    THE ESCROW AGENT:

    3.1    Scope of Powers, Duties and Obligations of the Escrow Agent.    Subject to the joint directions of Company and Agent which are accepted by Escrow Agent, the Escrow Agent has whatever powers are conferred by law and which are required to discharge its obligations and exercise its rights under this Escrow Agreement, including but not limited to the powers specified in the following Paragraphs of this Article, and the powers and authority granted to the Escrow Agent under other provisions of this Escrow Agreement. The Escrow Agent shall have no duties or obligations except those specifically set forth in this Escrow Agreement.

    3.2    Powers Exercisable by the Escrow Agent, Subject to this Agreement.    The Escrow Agent is authorized and empowered to exercise the following powers, subject to the limitations contained in this Escrow Agreement:

        3.2.1    To employ agents, including public accountants and legal counsel (which may be in- house counsel for Escrow Agent), as it shall determine appropriate, and to pay their reasonable expenses and compensation from Escrow Funds;

        3.2.2    To rely on Company and Agent to defend and litigate, or settle, at their expense, any suit brought against the Escrow Funds or any order sought to be satisfied out of the Escrow Funds, without duty on the Escrow Agent beyond forwarding related papers to Company and Agent and complying with any final order to the extent of the Escrow Funds;

        3.2.3    To withhold from taking any action until it receives proper written notice of an occurrence of an event affecting this Escrow;

        3.2.4    To treat as genuine, sufficient and correct, in form, execution and validity, and as the document it purports to be, and from the party it purports to be from, any notice, instruction, letter, paper, telex or other document purported to be furnished to Escrow Agent by Company or Agent and believed by Escrow Agent to be both genuine and to have been transmitted by the proper party or parties, and Escrow Agent shall have no liability with respect to any action taken or foregone by Escrow Agent in good faith in reliance on such document;

        3.2.5    To deposit the Escrow Funds, into a CNI Charter Prime Money Market Fund account;

        3.2.6    To be fully released and discharged from any obligation to perform any further duties imposed upon it with respect to this Escrow following its resignation or removal and the appointment of a successor; and

        3.2.7    To be free from any liabilities or change in duties, other than as may be specifically described elsewhere herein, for the action or inaction of a party to this Escrow Agreement, or any other party, or the occurrence or non-occurrence of an event outside of this Escrow.

REVEREsalesagencyagmnt
5-22-02                                         34

4.    ESCROW AGENT NOTICES AND INSTRUCTIONS:

4.2    **Instructions; Notices.**    Except as hereafter provided, any directions, instructions or notices which the Company and Agent or any other duly authorized person is required or permitted to give to the Escrow Agent under this Escrow Agreement (the "Instructions") shall be in writing and shall be deemed effective upon receipt by the Escrow Agent; provided, however, that the Escrow Agent in its discretion may act upon oral Instructions if it believes them to be genuine, but the Escrow Agent shall not be required to do so.    If the Escrow Agent requires, all oral Instructions are to be promptly confirmed in writing, but the Escrow Agent shall not be liable for any action or any failure to act in accordance with oral Instructions, even though it fails to receive written confirmation from the Company and Agent.    The Escrow Agent shall be provided with specimen signatures of the authorized representatives of the Company and Agent.    The Escrow Agent shall be entitled to rely in good faith upon any Instructions signed by any authorized representative of the Company and Agent, and shall incur no liability for following such directions. Any written notices, affidavits or other communications hereunder shall be deemed to have been duly given if delivered or mailed first class, certified mail, postage prepaid, addressed as follows:

City National Bank, a national banking association
1950 Avenue of the Stars, 2nd Floor
Los Angeles, Ca. 90067
        Attn: Sue Behning, Vice President
Tel: (310) 282-2921
Fax: (310) 282-2926

CineVisions
9051 Oriole Way
Los Angeles, CA
90069
        Attn: Peter Hoffman
Tel: 310-887-3830
Fax: 310-887-3840


[to be completed]

4.2    **Photostatic Teletransmission.**    The transmission of the Instructions by photostatic teletransmission with duplicate or facsimile signatures shall be an authorized method of communication until the Escrow Agent is notified by the Company or Agent to the contrary.

4.3    **Additional Instructions.**    In any matter under this Escrow Agreement in which the Escrow Agent is permitted or required to act upon Instructions, the Escrow Agent, where it deems necessary, may request further Instructions from the person or entity giving the original instructions, or from the Company and Agent, as the case may be, and may defer any and all action pending receipt thereof.

5.    COMPENSATION AND EXPENSES OF THE ESCROW AGENT:    Escrow Agent's fees will be as set forth on the fee schedule attached hereto as Schedule C, plus actual expenses incurred in

performing its duties hereunder, and Escrow Agent is hereby granted a lien on the Escrow Funds for such amounts. Any setup fee will be payable in advance. If at any time cash is not available in the Escrow Funds to pay the Escrow Agents compensation and expenses, and then Escrow Agent may bill Company and Agent for such amounts.

6.    RECORDS AND ACCOUNTS:

6.1    Accurate Records and Accounts. The Escrow Agent shall keep accurate records and accounts with respect to all cash and other assets held by it in the Escrow Fund, and all receipts and disbursements and other transactions involving such cash, securities and other assets. The Company and Agent shall have access to all such accounts, books and records at all reasonable times. All such accounts, books and records shall be open for inspection and audit at all reasonable times by the Company and Agent or by any person or persons duly authorized by the Company or Agent.

6.2    Periodic Reports. The Escrow Agent shall furnish the Company and Agent and any third party with such periodic reports, as the Company, Agent and the Escrow Agent shall mutually agree, setting forth all receipts, disbursements and transactions effected by the Escrow Agent.

6.3    Principal and Income. Except as otherwise specifically provided in this Escrow, the determination of all matters with respect to what is principal or income of the Escrow Fund and the apportionment and allocation of receipts and disbursements between these accounts (if any), shall be governed by the provisions of the California Revised Uniform Principal and Income Act from time to time existing. Any such matter not provided for herein or in the California Revised Uniform Principal and Income Act shall be determined by the Escrow Agent in the Escrow Agent's discretion.

6.4    Income Tax Reporting. Company and Agent assume all duties to file any and all tax reports and returns, except as noted below, as well as full responsibility for the payment of all taxes assessed on or with respect to any Escrow Funds distributed and all taxes due on the income collected for Company or Agent on any and all transactions with respect to the Escrow Funds. For purposes of IRS form 1099, which Escrow Agent may be required to prepare and file, all reportable income shall be reported to the IRS as being attributable to either the Company or Agent, as paid out of the Escrow Fund.

7.    CANCELLATION AND CLOSING

7.1    This Escrow Agreement shall automatically terminate at the month end which is at least one hundred and eighty (180) days after the last receipt or disbursement into or out of the Escrow Fund. Funds held shall be distributed as provided in Section 2.4 without regard to the $2,000.00 minimum.

7.2    In any event, this Escrow Agreement shall terminate five years from the date of this Agreement and all assets then remaining, less any fees and out-of-pocket expenses due the Escrow Agent, shall be distributed as provided in Section 2.4 without regard to the $2,000.00 minimum.

8.    RESIGNATION AND REMOVAL OF THE ESCROW AGENT

8.1    Resignation and Removal. The Escrow Agent may resign at any time upon thirty (30) days' written notice to the Company and Agent, unless a shorter period is acceptable to the Company

and Agent. The Company and Agent may, jointly, at any time remove the Escrow Agent upon thirty (30) days' written notice to the Escrow Agent, unless a shorter period is acceptable to the Escrow Agent.

8.2    **Appointment of Successor.** In the event of the removal or resignation of the Escrow Agent, the Company and Agent shall, jointly, appoint a successor which, upon its acceptance in writing of such appointment delivered to the Company and Agent and the former Escrow Agent, shall be vested with all the rights, powers and duties of the Escrow Agent under this Escrow Agreement, and the retiring Escrow Agent shall be released and discharged from all further liability with respect to the Escrow. If the Company and Agent fail to appoint a successor Escrow Agent within thirty (30) days after removal or resignation of the Escrow Agent, the Escrow Agent is authorized to deliver the Escrow Fund to the Company and Agent by Escrow Agent's official check payable, jointly, to both Company and Agent for the amount to be distributed pursuant to Section 2.4 without regard to the $2,000.00 minimum. After settlement of the retiring Escrow Agent's final accounting, the retiring Escrow Agent shall also transfer to the successor Escrow Agent true copies of its records as relate to the Escrow Fund, as may be requested by the successor Escrow Agent. The successor Escrow Agent shall not be liable or responsible for anything done or omitted in the administration of the Escrow Fund pursuant to this Escrow Agreement prior to the date it shall have become Escrow Agent, nor to audit or otherwise inquire into or take any action concerning the acts of any retiring Escrow Agent.

8.3    **Final Periodic Report.** Within sixty (60) days after the transfer of the assets of the Escrow Fund to the successor Escrow Agent, unless a different period is mutually agreed to, the Escrow Agent shall file with the Company and Agent a final periodic report, covering the period since the close of the last periodic report.

8.4    **Deemed Acceptance.** In the absence of any exception thereto filed in writing with the Escrow Agent within ninety (90) days after the date of filing with the Company and Agent, any periodic report filed with the Company and Agent shall constitute a final periodic report by and discharge of the Escrow Agent from all claims and liabilities with respect to the acts and transactions as shown in such report, and shall be binding and conclusive upon all persons.

9.    **LIMITATION ON LIABILITY**

9.1    **Liability of Escrow Agent.** In performing any duties under this Escrow Agreement, Escrow Agent shall not be liable for any damages, losses, or expenses, except for gross negligence or willful misconduct on the part of the Escrow Agent. Escrow Agent shall not incur any liability for: (a) any act or failure to act made or omitted in good faith, or (b) any action taken or omitted in reliance upon any instrument, including any written statement or affidavit provided for in this Escrow Agreement that the Escrow Agent shall in good faith believe to be genuine, nor will the Escrow Agent be liable or responsible for forgeries, fraud, impersonations or determining and verifying the scope of any representative authority, or any person acting or purporting to act on behalf of any party to this agreement.

9.2    **Indemnification by Company and Agent.** Company and Agent further agree to pay on demand, and to indemnify and hold Escrow Agent harmless from and against, all costs, damages, judgments, attorneys fees, expenses, obligations and liabilities of any kind or nature which, in good faith, Escrow Agent may incur or sustain in connection with or arising out of the Escrow, and Escrow Agent is hereby given a lien upon all the rights, titles and interests of the Company and Agent in the

Escrow Funds, to protect Escrow Agent's rights and to indemnify and reimburse Escrow Agent under this Escrow Agreement.

9.3    Force Majeure. The Escrow Agent shall not be liable for any delay or failure to act as may be required hereunder when such delay or failure is due to fire, earthquake, any act of God, interruption or suspension of any communication or wire facilities or services, war, emergency conditions or other circumstances beyond its control, provided it exercises such diligence as the circumstances may reasonably require.

9.4    Scope. The Escrow Agent shall have no duties or obligations hereunder except those specifically set forth herein and such duties and obligations shall be determined solely by the express provisions of this Escrow Agreement.

9.5    Controversies.

9.5.1    Upon receipt of conflicting demands or notices relating to this Escrow, Escrow Agent may, at its election, without liability to Company or Agent, do either or both of the following:

(a)    Withhold and stop all further proceedings in, and performance of, this Escrow, until such conflict is removed to Escrow Agent's satisfaction;

(b)    File a suit in interpleader and obtain an order from the court requiring the parties to litigate their several claims and rights among themselves, in which case, Escrow Agent shall be fully released and discharged from any obligation to perform any further duties imposed upon it with respect to this Escrow, and the parties shall pay Escrow Agent all costs, expenses and reasonable attorney fees expended or incurred by it, the amount thereof to be fixed and a judgment thereof to be rendered by the court in such suit.

9.5.2    Any dispute arising out of or relating to this Escrow Agreement, including a breach of this Escrow Agreement, will be decided by reference under California Code of Civil Procedure §638 and related sections. A referee, either an active attorney or retired judge, will be selected according to the procedures of the American Arbitration Association and then appointed by the court in which the action regarding the dispute or controversy originated. The dispute will be submitted to the referee for determination in place of a trial before a judge and jury.

9.6    Legal Counsel. The Escrow Agent may consult with, and obtain advice from, legal counsel of its own selection as to the construction of any of the provisions of this Escrow Agreement or the Escrow Agent's obligations and duties, and shall incur no liability in acting in good faith in accordance with the reasonable advice and opinion of such counsel.

10.    MISCELLANEOUS

10.1    Governing Law. This Escrow Agreement shall be governed, construed, regulated and administered under the laws of the State of California.

10.2    Invalid Provisions. It is not the intention of any party to this Escrow Agreement to violate any statute, regulation, ruling, judicial decision, or other legal provision applicable to this Escrow Agreement or the performance thereof. If any term of this Escrow Agreement, or any act or omission in

REVEREsalesagencyagrmnt
5-22-02

38

the performance thereof, is or becomes violative of any such provision, such term, act or omission shall be of no force or effect and any such term shall be severed from this Escrow Agreement. Any such invalid term, act or omission shall not affect the validity of any other term of this Escrow Agreement that is otherwise valid, nor the validity of any otherwise valid act or omission in the performance thereof, unless such invalidity prevents accomplishment of the objectives and purposes of this Escrow Agreement. In the event any such term, act or omission is determined to be illegal or otherwise invalid, the necessary steps to remedy such illegality or invalidity shall be taken immediately by the parties.

10.3   **Amendment.**  This Escrow Agreement may be modified at any time by writing signed by Company, Agent and Escrow Agent.

10.4   **Counterparts.**  This Escrow Agreement may be executed in several counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument, which may be sufficiently evidenced by any one counterpart.

10.5   **Successors and Assigns.**  This Escrow Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their successors and assigns, except as is expressly provided to the contrary herein.

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed by their respective duly authorized officers on the dates set forth below.

"Company"                          [___]

                                   By: _____
Date: _____

"Agent"                            CineVisions

                                   By: _____
Date: _____

"Escrow Agent"                     **City National Bank,** a
                                   national banking association

                                   By: _____
                                       Sue Behning, Vice President

REVEREsalesagencyagmnt
5-22-02                            39

## EXHIBIT "D"

### DELIVERY REQUIREMENTS

1.     Delivery Items: Delivery of the Picture shall consist of the Groups making physical delivery, at the sole cost and expense of the Groups, of the items required in the Sub-Distribution Agreements or the items set forth herein to such delivery location as hereinafter designated or as the parties shall otherwise designate.

A.  Delivery Locations:

1. "Laboratory" means [UK laboratory chosen by Producer]

B.  Picture Items:

1. Original Picture Negative: The original 35mm picture negative, which shall: (a) conform to the American National Standards Institute Catalogue reference P.H. 22.59, "35mm Motion Picture Camera Aperture Images"; (b) be fully cut, edited and assembled complete with credits and main, narrative (if any), end and all descriptive titles; (c) conform in all respects to the final edited version of the action work print of the Picture; and (d) be in all respects ready and suitable for use in the printing of commercially acceptable positive prints.

2. Magnetic Soundtrack: One (1) 35mm original three-track magnetic master, Dolby-A encoded (if applicable), which shall: (a) consist of separate dialogue, music and sound effects, fully recorded; (b) be equalized and in perfect synchronization with the Picture action; (c) conform in all respects to the Answer Print; and (d) be technically acceptable and if the Picture is to be released with an alternate sound system (e.g. Dolby Stereo): (a) a standard four-track magnetic sound master that includes left, centre, right, and surround signals, and that is Dolby-A encoded; or (b) a Dolby Stereo optical encoded two-stripe magnetic sound master. If the Picture is to be released in 70mm: a six-track magnetic sound master that includes left, centre, right, surround signals and two boom tracks. All soundtracks that are Dolby-A encoded shall include at least 30 seconds of "Dolby set level tone" at the head of each reel and 30 seconds of "pink noise" at the head of one reel.

3. Soundtrack Negative: One (1) fully mixed and recorded original 35mm optical soundtrack negative of the Picture, which shall be: ' (a) made from the Magnetic Soundtrack; (b) of technically acceptable quality; (c) prepared for printing in perfect synchronization with the Answer Print; and (d) technically acceptable in accordance with Paragraph 1.02 of the Agreement. If the Picture is to be released with an alternate sound system (e.g. Dolby Stereo), the appropriate stereo optical soundtrack negative is to be delivered. If the Picture is to be released in 70mm, the optical soundtrack negative corresponding to 70mm is to be delivered.

4. **Answer Print:** One (1) first-class ~35mm composite, fully timed print of the Picture, which shall be: (a) manufactured from the Original Picture Negative and Soundtrack Negative, (b) fully titled, (c) in perfect synchronization and conformed to the final edited version of the action work print of the Picture, (d) approved by the Distributor, and (e) technically acceptable in accordance with Paragraph 1.02 of the Agreement, and in all respects ready and suitable for distribution and exhibition.

5. **Colour Interpositive Protection Master:** If the Picture is in colour, one (1) 35mm fully timed interpositive master of the Picture, conformed in all respects to the Answer Print. If the Picture is in black and white, one (1) 35mm fully timed fine grain master of the Picture, conformed in all respects to the Answer Print.

6. **Internegative:** If included in the approved Picture budget, one (1) internegative manufactured from the interpositive conformed in all respects to the delivered and accepted answer print, and one (1) composite spliceless check print from each such internegative.

7. **Titles/Textless Background:** (a) One (1) 35mm fully timed textless background negative of the main, credits, narrative (if any), and end titles, conformed in all respects to the Original Picture Negative, and (b) one (1) 35mm action-only positive print made from the timed textless negative.

8. **Deleted.**

9. **Television Cover Shots:** Cover shots of the Picture satisfactory to the Distributor which will enable the Distributor to make a version of the Picture acceptable for exhibition on television in the Territory.

10. **Film Materials:** Prints, interpositives, sound effects tracks, dialogue tracks, music tracks and other film materials including lifts, trims, and outtakes made in connection with the production of the Picture.

11. **Work Materials:** The action work print and cutting continuity book including the film editor's script notes and logs.

12. **Continuities:** One (1) legible typewritten copy in the English language of a detailed, final dialogue and action continuity of the ' Picture containing all dialogue, narration, song vocals, as well as a cut by cut description of the Picture action, conforming exactly to the photographic action and soundtracks of the completed Picture as embodied in the Answer Print. The Continuities shall be in such form as to be suitable for transmission to censorship authorities and for use in connection with dubbing and sub-titling of the Picture. If the dialogue of the Picture was recorded in a language other than English, the Continuity shall contain a literal English translation.

13. **Music Cue Sheets:** One (1) copy of a music cue sheet showing the particulars of all music contained in the Picture, including the sound equipment used, the title of each composition, the names of composers, publishers, and copyright Groupss, the usages (whether instrumental, instrumental-visual, vocal, vocalvisual or otherwise), the place and number of such uses showing the

film footage and running time for each cue, the performing rights society involved, and any other information customarily set forth in music cue sheets.

14. **Musical Score/Lead Sheets/Songs:** The conductor's score of all instrumental and vocal parts of all music recorded for the Picture, and the composer's orchestra sketches, if prepared, and the composer's lead sheets for the entire musical score of the Picture and for the music and lyrics of each song composed for the Picture. A notated score of all instrumental and vocal parts of all music recorded for the Picture.

C. **Trailer Production Materials:** The Groups shall deliver to the Distributor not later than two (2) weeks after the completion of the first cut of the Picture prepared by the director and presented to the Groups (the "Distributor's First Cut"), unless the Distributor notifies the Groups that the Distributor anticipates that it will release the Picture on a date more than two months after the proposed delivery date, in which case the Groups shall deliver not later than one (1) week after completion of the last cut of the Picture prepared by the director or the Groups prior to the final mix of the Picture (the "Last Cut"), the following:

1. **Black and White Dupe:** One (1) black and white dupe of the action work print of the Director's First Cut or the Last Cut, as applicable.

2. **Soundtrack:** One (1) 35mm full coat magnetic film soundtrack consisting of separate dialogue, music and sound effects and conforming to the soundtrack of the action work print of the Director's First Cut or the Last Cut, as applicable.

D. **Documentation:**

1. **Literary Materials:** A copy of the final shooting script of the Picture and all related copyright filings.

2. Deleted.

3. Deleted.

4. **Dubbing Restrictions:** A statement of any restrictions as to the dubbing of the voice of any player including dubbing dialogue in a language other than the language in which the Picture was recorded.

5. **Contracts:** To be delivered if requested by the Distributor: Duplicate originals or legible copies of all agreements, licenses, waivers or other documents relating to the production of the Picture, including but not limited to:

(a) **Basic Material:** Those covering the acquisition of literary, dramatic and other works and material of whatever nature upon which the Picture may be based and/or used in the production of the Picture, including copyright and title search reports.

REVEREsalesagencyagmmt
5-3-02 / cro REDLINE                                3

(b)  **Music and Lyrics:** Those covering the acquisition and performance of all music and lyrics utilized in connection with the Picture.

(c)  **Service Contracts:** Those covering the rendition of services by writers, players, producers, directors, extras, and all other persons rendering any services in connection with the Picture.

(d)  **Rental Contracts:** Those covering set and location rentals and clearances, and equipment rentals. (Deliver to Production Accounting).

(e)  **Production Contracts:** Those covering photographic releases and the rendition of services by production personnel. (Delivery to Production Accounting).

(f)  **Featurette Clearances:** Those covering the right to use an individual's name and likeness in featurette motion pictures dealing with the Picture.

6.  **Music Licenses and Assignment:** A copy of valid licenses for the full period of copyright in the Picture for the synchronous recording of all copyrighted music in the Picture and the performance thereof in the Territory, and evidence of full payment therefor. If the rights granted to the Distributor include music publishing rights, an assignment from the composer of all original music written for the Picture, to the Distributor or its designees, duly executed and acknowledged by such composer.

7.  **E & O Insurance:** A copy of a "Motion Picture Producer and Distributor Errors and Omissions" insurance policy naming the Distributor as an additional named insured, which policy shall have limits of at least $1,000,000 with respect to any one claim relating to the Picture and $3,000,000 with respect to all claims relating to the Picture in the aggregate. Said policy shall be for a term of not less than three (3) years commencing as of delivery of the Picture to the Distributor together with evidence indicating that the premium for such policy has been paid in full for the three (3) year term. Said policy shall include a provision that it may not be revised, modified or cancelled without the written consent of the Distributor and shall include a provision that it shall be deemed to be primary insurance and that any insurance obtained by the Distributor shall be excess insurance not subject to exposure until the insurance coverage of the delivered policy shall be exhausted. Said policy to be delivered to the Distributor not later than three (3) weeks prior to the commencement of principal photography of the Picture.

8.  **Laboratory Access Letters:** Any laboratory access letters which may be requested by the Distributor and which are in form and substance acceptable to the parties hereby acting reasonably.

E.  **Publicity and Advertising Materials:** To be delivered to the Distributor not later than three (3) weeks after the completion of principal photography of the Picture (if principal photography has not been completed at the time of the signing of this Agreement) or upon the conclusion of the signing of this Agreement (if principal photography of the Picture has been completed at such time):

1 . **Stills:** The original negative and one (1) positive print of two hundred fifty (250) different black and white still photographs, and colour transparencies of one hundred-seventy five (175) different colour still photographs, all photographed by an experienced still photographer assigned to the Picture during at least three (3) weeks of principal photography of the Picture. Said still photographs shall depict different scenes from the Picture, production activities, and informal poses, the majority of which depict the principal members of the cast. Each still photograph shall be accompanied by a notation identifying the persons and events depicted and shall be suitable for reproduction for advertising and publicity purposes. If a player has still approval, the Groups shall furnish the Distributor an appropriate written clearance from the player. The Groups shall furnish the Distributor a positive print or colour transparency of all other still photographs photographed in connection with the production of the Picture. The Distributor shall have the right to borrow, for a reasonable time, the negative of any of such other material for the purpose of making reproductions thereof.

2. **Biographies:** One (1) biography (one to three typewritten pages in length) of each of the principal players, writers, individual producer and director of the Picture, including information, if available, as to the individual's height, weight, colour of hair and eyes, and, in the case of actresses, clothing size.

3. Deleted.

4. **Production Notes:** Notes as to the production of the Picture prepared by the Unit Publicist, including items relating to: underlying work (original screenplay, book, etc.); places where the Picture was photographed; any interesting anecdotes dealing with the production or background of the Picture.

5. **Synopsis:** Ten (10) copies of the brief synopsis in the English language (one type-written page in length) of the story of the Picture and ten (10) copies of a synopsis in the English language (three type-written pages in length) of the story of the Picture.

6. **Advertising Materials:** One (1) copy of all advertisements, paper accessories and other advertising materials, if any, prepared by the Groups or by any other party in connection with the Picture, including samples of one-sheet posters and individual advertising art elements and transparencies necessary to make proofs thereof.

7. **Credits:** The statement of credits applicable to the Picture including verification of the writing credits by the appropriate writers guild and photographic excerpts of all the Groups's obligations (taken from the actual contract) to accord credit on the screen, in advertising, in paperbacks and on recordings; and excerpts as to any restrictions as to use of name and likeness. Said credits shall conform to the standard credit requirements of the Distributor for comparable artists unless otherwise agreed to in the Agreement.

8. **Cast:** One (1) copy of a list indicating the name of the character portrayed by each player and a complete description of the character.

9. **Technical Crew:** One (1) copy of a list of all technical personnel (including their title or assignment) involved in the production of the Picture.

REVEREsalesagencyagmnt
5-3-02 / cro REDLINE                                5

10. **Titles:** Two (2) typewritten lists of the main credits and end titles of the Picture.

11.    **Incomplete Delivery:** To the extent that any such materials or documents are incomplete or fail to meet the requirements specified herein, the Distributor shall so notify the Groups, and the Groups shall immediately thereafter correct all such deficiencies by making delivery to the Distributor of the proper materials and documents required hereunder. Acceptance by the Distributor of less than all of the items required for delivery of the Picture and/or release of the Picture shall not be construed as a waiver by the Distributor of the Groups's obligation to deliver any item required hereunder. Under no circumstances shall the Groups be relieved of the obligation to deliver all of the materials and documents required hereunder, nor shall the Distributor be deemed to have waived any of the said delivery requirements unless the Distributor shall so notify the Groups in writing designating the particular item or items which need not be delivered by the Groups to the Distributor. The cost of any item of delivery which is omitted by the Groups or is supplied by the Distributor by reason of the Groups's failure to deliver the item shall be charged to the Picture as a Distribution Expense item or deducted from the first amounts otherwise payable to the Producer under the Agreement, or shall be paid for by the Groups immediately upon the Distributor's request, as the Distributor in its sole discretion may determine. THE TIMELY AND COMPLETE DELIVERY OF THE ITEMS SPECIFIED IN THIS SCHEDULE IS A CONDITION PRECEDENT TO ANY OBLIGATION THE DISTRIBUTOR MAY HAVE OR MAY UNDERTAKE TO PAY ANY AMOUNTS, OTHER THAN ANY ADVANCES PAYABLE HEREUNDER, DUE TO THE GROUPS PURSUANT TO THIS AGREEMENT, INCLUDING ANY RESIDUALS PURSUANT TO THE APPLICABLE COLLECTIVE BARGAINING AGREEMENTS.

EXHIBIT "B"
I'LL SLEEP WHEN I'M DEAD
ask/accept    April 5, 2002

Projections For Avail. Rts.                    Sales in Progress

| Primary Territories (ex | Ask | Accept | Prospective Cl | Paramount Dea | Param. Terms (if other than all rts.) |
|---|---|---|---|---|---|
| Australia | | | Paramount | 1,000,000 | ** (includes asterisked Territories below) |
| BeNeLux (Dutch) | 100,000 | 60,000 | RCV/Dutch Films | | |
| France | 250,000 | 150,000 | Pathe/Pyramide/ | 150,000 | all TV |
| Germany | 800,000 | 600,000 | Kirsch/Telepool/Splendid | 1,200,000 | all TV |
| Italy | 500,000 | 300,000 | CDI/Nexo | | |
| Japan | | | Paramount | 250,000 | Pay TV |
| Portugal | 25,000 | 20,000 | Lusomundo | | ** (included above) |
| Scandanavia | 150,000 | 100,000 | Scanbox | | |
| South Africa | 50,000 | 35,000 | Warner-Nu Metro | | |
| South Korea | 150,000 | 75,000 | UIP | | |
| Spain | 400,000 | 300,000 | Manga | | |
| Taiwan | 100,000 | 50,000 | CMC Magnetics | | |
| United Kingdom (ex Pay T | 750,000 | 350,000 | Momentum | | |
| United Kingdom (Pay TV) | | | Paramount | 750,000 | Pay TV |
| Primary Sub Total | 0000000 | 0000000 | | 3,350,000 | |
| Secondary Territories | | | | | |
| Mexico | | | | | |
| Latin America | | | | | |
| ArOP | - | - | | | |
| Brazil | - | - | | | |
| Central America | - | - | | | |
| Chile | - | - | | | |
| Columbia | - | - | | | |
| Ecuador | - | - | | | |
| Peru/Bolivia | - | - | | | |
| Venezuela | - | - | | | |
| West Indies | - | - | | | |
| Latin America Total | | | Paramount | | ** (included above) |
| Eastern Europe | | | | | |
| Bulgaria | - | - | | | |
| Yugoslavia | - | - | | | |
| Czech Rep/Slovakia | - | - | | | |
| Hungary | - | - | | | |
| Poland | - | - | | | |
| Romania | - | - | | | |
| Eastern Europe Total | 125,000 | 75,000 | | | |
| CIS (Russia) | 35,000 | 20,000 | MGN Paradise | | |
| Greece | 20,000 | 35,000 | V. Roadshow Greece | | |
| Hong Kong | 10,000 | 7,500 | | | |
| Iceland | 5,000 | 2,000 | Myndform | | |
| Israel | 35,000 | 25,000 | Noah Communications | | |
| India | 10,000 | 5,000 | | | |
| Indonesia | 15,000 | 5,000 | | | |
| Malaysia | 15,000 | 5,000 | | | |
| Middle East | | | Paramount | | ** (included above) |
| Philippines | 15,000 | 7,500 | Sky Films | | |
| Singapore | 5,000 | 2,500 | Shaw Renters | | |
| Thailand | 15,000 | 10,000 | | | |
| Turkey | 20,000 | 10,000 | Aqua Group | | |
| Secondary Sub Total | 325,000 | 189,500 | | 0 | |
| TOTAL | 0000000 | 0000000 | | 3,350,000 | |